UNITED STATES of America,
Plaintiff-Appellee,

v.

Bryant L. HAMPTON,
Defendant-Appellant.

No. 84–3708.

United States Court of Appeals,
Eleventh Circuit.

Nov. 13, 1985.

James M. Russ, Terrence E. Kehoe, Orlando, Fla., for appellant.

Bruce Hinshelwood, Robert Stanley Powell, Asst. U.S. Attys., Orlando, Fla., for appellee.

Before VANCE and HATCHETT, Circuit Judges, and LYNNE *, District Judge.

LYNNE, District Judge:

Appellant entered a conditional plea of guilty in this cause, pursuant to Fed.R. Crim.P. 11(a)(2).[1] In doing so, appellant reserved the right to seek appellate review of the trial court's rulings on certain pretrial motions. The appellant has now exercised this right. Having reviewed the merits of the various pretrial motions at issue, this Court concludes that as to one of the pretrial motions, the district court's ruling is due to be reversed. We do not address the remaining motions.

## FACTS AND PROCEEDINGS BELOW

### The State Investigation

On March 7, 1979, a large-scale marijuana smuggling operation was discovered by state authorities in Bonita Springs, Florida. A lengthy state investigation ensued, and a number of arrests were made. Among

---

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. Fed.R.Crim.P. 11(a)(2) provides as follows:

   *Conditional Pleas.* With the approval of the court and the consent of the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion. If the defendant prevails on appeal, he shall be allowed to withdraw his plea.

those questioned in the course of the investigation was appellant Bryant L. Hampton, a local real estate broker whose name appeared on county records as the trustee of a residence at 31 McGlaughlin Street, a residence which had been found to contain a large amount of marijuana.

On March 7 and March 12, 1979, Hampton gave unsworn, unimmunized statements to state law enforcement officials. In these statements Hampton discussed in general terms his part in arranging the cash sale of the residence at 31 McGlaughlin Street from its previous owners to certain individuals, by virtue of which Hampton was initially listed on county records as owner in trust of such property. Hampton also discussed at this time his ownership of a "stilt house" located in an area known as Fishtrap Village, where marijuana residue had previously been discovered and which Hampton claimed to have been leasing to certain other individuals. These statements were promptly summarized in case reports prepared by state investigators, but were not otherwise preserved or recorded.

Subsequently, in November of 1979, Mr. Hampton received a subpoena to appear before the Lee County (Florida) Grand Jury and produce certain records. At this time, the State of Florida was pursuing criminal charges against one Warren Musselwhite, then believed to be a major figure in the financing of the marijuana operation. Pursuant to the subpoena, Mr. Hampton testified before the grand jury on November 5, 1979. He also provided a number of documents requested, all related to the two pieces of property described above and two other properties linked to the investigation. Hampton's testimony of November 5, 1979, included various details and topics not discussed in the earlier unimmunized statements, including Hampton's relationship with Musselwhite and other individuals under investigation. Under Florida law, since this testimony was given pursuant to a subpoena, it resulted in automatic transactional immunity from state prosecution. *See* § 914.04, Florida Statutes. This testi-

mony was stenographically recorded and later transcribed.

Later, on May 15, 1980, Mr. Hampton gave additional immunized testimony pursuant to a subpoena from the State's Attorney's office. This testimony, given in response to interrogation from Lee County Investigator William McQuinn and Assistant State's Attorney Stephen B. Russell, also discussed matters not covered in the investigator's summaries of Hampton's prior unimmunized statements. This time Hampton's testimony was recorded on audio cassette tape. Because Hampton enjoyed state transactional immunity, he was never charged in connection with the state investigation. The state narcotics charges against Musselwhite were ultimately dismissed.

### The Federal Investigation

In 1981, federal officials in Orlando, Florida, began investigating Warren Musselwhite and others on income tax and narcotics violations. Musselwhite, of course, had been linked to the Bonita Springs marijuana operation. On June 1, 1981, all investigative files of the Lee County State's Attorney's office related to the Bonita Springs investigation were delivered by Investigator McQuinn to Internal Revenue Service agents in Orlando, Florida. Included in these materials was a copy of the cassette tape containing Mr. Hampton's May 15, 1980, testimony. On June 23, 1981, the Lee County Grand Jury transcripts, including transcripts of Hampton's immunized grand jury testimony, were turned over to a federal grand jury in Orlando as part of the ongoing federal investigation. Thereafter, the state materials were accessible to numerous federal attorneys and agents, including IRS Agent Thomas Altif, and were used as a basis for further investigation by federal authorities.[2] In addition, federal authorities were briefed by state investigators on several occasions as to the information collected during the state investigation. State investigators discussing the case with federal

2. *See* Vol. IV, pp. 60, 83–85.

agents did not inform the federal agents that the state investigation and portions of the materials transferred included immunized testimony,[3] nor did they attempt to separate immunized testimony and its fruits from other information in briefing federal officials.[4]

Consequently, as they reviewed the information and materials conveyed by state officials and used them as a basis for further investigation, the federal authorities were unaware that portions of the state materials included immunized testimony, and that some of the other evidence and information conveyed by state officials may have been derived therefrom.[5]

In July, 1981, Mr. Hampton was subpoenaed to appear before the federal grand jury in Orlando. Mr. Hampton appeared before this grand jury on July 14, 1981, and upon advice of counsel invoked his Fifth Amendment privilege against self-incrimination. Assistant United States Attorney Donald Christopher and Department of Justice Attorney Patricia Pilleggi were responsible for the 1981 grand jury investigation.[6] While Mr. Christopher denied having read any transcript or listened to any tape of immunized testimony, he acknowledged that Ms. Pilleggi may have.[7] Moreover, Mr. Christopher admitted that in preparing his own interrogations of the various grand jury witnesses, he relied heavily upon case summaries and outlines prepared by the federal investigative agents,[8] who admittedly had access to the state investigative files,[9] presumably including the immunized testimony contained therein, and

who had admittedly consulted with state investigative officials about the case, all without any cognizance of the fact that some of the materials and information conveyed by state officials may have been derived directly or indirectly from Hampton's immunized testimony.[10] The record further indicates that the federal agents assisted in the preparation and issuance of subpoenas to various grand jury witnesses, and that in doing so the agents relied upon information gleaned from the state investigative files.[11]

The initial federal grand jury investigation of Musselwhite focused primarily on allegations of tax fraud and related narcotics violations by Musselwhite. This grand jury investigation concluded in the spring of 1982. Of course, federal prosecutors and investigative agents continued to investigate the case and pursue leads, and in doing so obviously had the benefit of all of the information developed in the 1981 federal grand jury proceedings as well as the information developed previously by state and federal officials.

In approximately September of 1983, a second federal grand jury investigation was commenced in Orlando, this time centering upon allegations of money-laundering by Warren Musselwhite in connection with the purchase of certain real estate used in the Bonita Springs marijuana operation, including the residence at 31 McGlaughlin Street. As noted above, Bryant Hampton was directly involved in this real estate transaction. Although his unimmunized statements to state investiga-

---

3. The record shows that federal officials were not aware that Florida law automatically conferred transactional immunity on witnesses subpoenaed to testify before a state grand jury, and the grand jury transcripts of Hampton's November 5, 1979, testimony do not reflect the fact that the testimony was immunized. *See* Vol. IV, p. 157.

4. *See* Vol. IV, pp. 148–50, 157–58, 235–37; Vol. V, pp. 36–40.

5. The record indicates that it was not until November of 1983 that federal authorities first became aware that the information assimilated by virtue of the state investigation derived in part from immunized testimony. (Vol. IV, pp.

160–61, 246–47) (testimony of Agent Altif and AUSA Robert Powell at *Kastigar* hearing).

6. Vol. IV, pp. 75–76.

7. Vol. IV, p. 87.

8. Vol. IV, pp. 95–96.

9. *See, e.g.,* Vol. IV, pp. 83–85.

10. *See, e.g.,* Vol. IV, pp. 113–14, 149–50, 156–57 (testimony of IRS Agent Altif at *Kastigar* hearing).

11. Vol. IV, p. 115 (testimony of IRS Agent Altif at *Kastigar* hearing).

tors had referred to certain aspects of this transaction, Hampton's subsequent immunized statements revealed new details about this and other real estate transactions linked to the Bonita Springs investigation, including the use of cashier's checks to purchase the residence at 31 McGlaughlin.[12] The allegations of money-laundering against Warren Musselwhite were based primarily upon the government's contention that he participated in the purchase of 23 separate cashiers checks in denominations of $9500 or less in order to evade federal reporting requirements for currency transactions in excess of $10,000.[13] *See* 18 U.S.C. § 1001 *et seq.* These cashier's checks, totalling more than $210,000, were apparently used to purchase the residence at 31 McGlaughlin Street.

In October of 1983, the federal grand jury returned indictments against Musselwhite and others for money-laundering. These indictments were subsequently dismissed by the trial court due to misleading testimony presented to the grand jury by IRS Agent Altif, and due to improper use of state-immunized testimony by federal prosecutors and agents. It was at that time—in November of 1983—that federal authorities first discovered that the state investigative materials contained immunized testimony.[14]

Subsequently, Mr. Hampton was again subpoenaed to testify before the federal grand jury in Orlando on January 11, 1984. In response to this subpoena, Mr. Hampton appeared at the federal courthouse with his attorney, Rogerb Hagaman. There Mr. Hampton and Mr. Hagaman met with Assistant United States Attorney Kathleen O'Malley, Internal Revenue Service Agents Thomas Altif and David Leoce, and Florida Department of Law Enforcement Agent John Barr.[15] During that meeting, Mr. Hampton notified Assistant United States Attorney O'Malley that, if called before the grand jury, he would assert his Fifth Amendment privilege against self-incrimination.[16] Ms. O'Malley, who was not aware that Mr. Hampton had previously testified under a state grant of immunity, expressed the intent to obtain a grant of federal immunity for Mr. Hampton.[17] Based on her briefing by Agents Altif and Barr, Ms. O'Malley considered Mr. Hampton a potentially valuable witness against Warren Musselwhite.[18] Mr. Hampton was not released from this subpoena, but was instructed to return on a later date.

On February 7, 1984, Mr. Hampton, under compulsion of the same federal grand jury subpoena, came to Orlando to appear for the grand jury. Mr. Hampton and Mr. Hagaman met with Assistant United States Attorney Robert Stanley Powell and IRS Agent Altif. During a conference that followed that meeting, Agent Altif reviewed with Mr. Hampton case reports prepared by Mr. McQuinn, and a tape recording of Mr. Hampton's testimony of May 15, 1980.[19] Mr. Hampton never appeared before the grand jury on that date.

Sometime between February 7, 1984, and March 7, 1984, there was an important turn of events—Warren Musselwhite entered into a plea agreement with federal officials.[20] Pursuant to the agreement, Musselwhite agreed to testify against Mr. Hampton before the grand jury and at trial.[21]

---

12. *See* Defendant's Exhibit 2, pp. 182, 203 (Hampton's immunized grand jury testimony of November 5, 1979); Government's Exhibit 3, pp. 22–23 (Hampton's immunized interview of May 15, 1980).

13. Defendant's Exhibit 19, pp. 4–7.

14. Vol. IV, pp. 121, 246–47; Defendant's Exhibit 19, p. 8.

15. Agent Barr was at all times relevant to this case acting as a Special Deputy U.S. Marshal.

16. Vol. IV, pp. 180, 212.

17. Vol. IV, pp. 180, 213; Government's Exhibit 4.

18. Vol. IV, pp. 212–16; Government's Exhibit 4.

19. Vol. IV, pp. 184–89.

20. Vol. IV, pp. 125–26; Vol. V, pp. 16–17; Exhibit 12M, pp. 4–7.

21. *Id.*

On March 7, 1984, after hearing testimony from Warren Musselwhite and Agent Altif, the grand jury which had been investigating Musselwhite returned an indictment against Bryant Hampton, James Ronald ("Sonny") Wilson, and Robert M. ("Hooker") Brown. Count One charged the defendants with conspiracy to import marijuana; Count Two charged them with conspiracy to possess and distribute marijuana; Count Three charged importation of marijuana; and Count Four charged possession of marijuana with the intent to distribute.

Several federal prosecutors were responsible for the 1983–84 grand jury investigation that culminated in Hampton's indictment. AUSA Robert Powell denied having ever read Hampton's immunized statements or having personally developed any leads from them.[22] However, Mr. Powell admitted that he relied throughout the investigation upon investigative summaries prepared by state officials [23] and upon briefings by Agent Altif and Special Deputy Barr,[24] each of whom admittedly had access to the immunized materials and other information collected by the state after the immunized testimony was given.[25] Powell also conceded that the federal agents upon whom he relied had received the state materials and used them to work up leads in the case some two years before the agents became aware that there were immunity problems with some of the state information.[26] Consequently, during the course of the federal investigation prior to the discovery of the immunity problem and up until November of 1983, it is undisputed that federal investigators utilizing state briefings and materials had no special procedures or instructions to shield themselves from the immunized testimony (or information derived therefrom by state investigators), and made no effort to do so.[27]

Similarly, AUSA Kathleen O'Malley denied ever having personally read Hampton's immunized testimony, but she too conceded that she had relied extensively upon briefings and written summaries from Altif and Barr.[28] In fact, Ms. O'Malley admitted that Agent Altif even prepared the actual questions to be propounded to grand jury witnesses, including the questions that were to have been propounded to Hampton in his aborted grand jury appearance of January 11, 1984.[29] Ms. O'Malley was not aware at this time that some of the state investigative materials which the federal agents had received and used some two and one-half years earlier were immunized.[30]

Finally, AUSA Bruce Hinshelwood also denied having read Hampton's immunized testimony before he sought and obtained an indictment against Hampton, Brown and Wilson on March 7, 1984,[31] although he admitted reading Hampton's November 1979 state grand jury testimony in preparing for the hearings on the pretrial matters in the court below.[32] Hinshelwood also admitted that he had been briefed by Agents Altif and Barr prior to presentation of the case to the indicting grand jury.[33]

### Proceedings Below

Following his indictment, Mr. Hampton filed several pretrial motions seeking dis-

---

**22.** Vol. IV, p. 249.

**23.** Vol IV, pp. 255–60.

**24.** Vol. IV, pp. 246–48, 253–54, 256–57; Vol. V, pp. 6–8.

**25.** Vol. IV, pp. 53, 102–09, 115, 129, 139, 142, 145–52, 155–58, 220, 226–28, 232–37, 242, 247, 269, 272–74 (testimony of various state and federal officials at *Kastigar* hearing).

**26.** Vol. IV, p. 273.

**27.** *See* Vol. IV, pp. 56–57, 60–61, 98–99, 113–14, 138, 144, 146–51, 158, 168, 232–37, 239, 241–44, 247, 269–70, 272–77; Vol V, pp. 36–41, 60–61.

**28.** Vol. IV, pp. 209–10.

**29.** Vol. IV, pp. 209–10.

**30.** Vol. IV, pp. 212, 220.

**31.** Vol. V, pp. 20–21.

**32.** Vol. V, p. 23.

**33.** Vol. V, p. 19.

missal of the indictment on the grounds that (1) the government had failed to produce a sample of the alleged marijuana for defense testing; (2) the prosecutor had stampeded the grand jury; and (3) Counts Three and Four were barred by the statute of limitations. Each of these motions was denied by the district court without a hearing.

Additionally, Hampton filed pretrial motions seeking dismissal of the indictment on the grounds that the federal authorities had unlawfully utilized his state-immunized testimony to build a case against him, and that, in any event, the federal prosecution was barred by the state grant of transactional immunity. After an evidentiary hearing which lasted a day and a half, the trial court denied these motions as well. As to the question of improper use of immunized testimony, the trial court, ruling from the bench, summarized its holding as follows:

> ... [T]he Court is satisfied that the statements made in [March] of '79 were free and voluntary, not protected by the Fifth Amendment and not immunized. For the purpose of a Motion to Dismiss and for the purpose of going forward, I think the Government has shown that they do have a completely independent source and that no immunized statements were either used or that the leads that they had received prior to the immunized statements have not been tainted by the statements. So, the Motion to Dismiss will be denied.

(Vol. V, p. 77).

Following the denial of Hampton's pretrial motions, the trial court (with the assent of the government) accepted a conditional plea of guilty from Hampton as authorized by Fed.R.Crim.P. 11(a)(2). Pursuant to the plea agreement, Counts One, Two and Three of the indictment were dismissed by the government. Mr. Hampton's plea of guilty to Count Four, as specifically recognized by the court below, permitted Hampton to appeal the denial of the above-described pretrial motions. *See* Fed. R.Crim.P. 11(a)(2). Following entry of the plea, the lower court sentenced Hampton to three years in prison with a special parole term of two years. This appeal followed.

## DISCUSSION

In this appeal, Hampton challenges the rulings of the lower court on each of his pretrial motions. Because we find that the lower court was clearly erroneous in overruling the motion to dismiss premised upon the government's alleged use of Hampton's immunized testimony, we need not address Hampton's arguments with respect to the other pretrial motions.

As noted above, Appellant Hampton received transactional immunity from the State of Florida on the basis of his testimony of November 5, 1979, and May 15, 1980. It is well-settled that a state grant of transactional immunity does not automatically preclude federal prosecution on the same subject matter. *Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). However, it is also clear that

> [o]nce a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they have an independent, legitimate source for the disputed evidence.

*Murphy,* 378 U.S. at 79, n. 18, 84 S.Ct. at 1609, n. 18. In *Murphy,* the Supreme Court held the constitutional rule to be that

> ... a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits may not be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of [state-immunized] testimony and its fruits.

*Murphy,* 378 U.S. at 79, 84 S.Ct. at 1609. Thus, even though the *Murphy* court held that a federal prosecution was not automatically barred by a state grant of transactional immunity, it emphasized that the burden lay on the federal authorities to show "that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." *Id.,* at 79 n. 18, 84 S.Ct. at 1609 n. 18.

In *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court further explained the scope and effect of such "use and derivative use" immunity:

> This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an "investigatory lead," and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures. A person accorded ... immunity ... and subsequently prosecuted, is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities. As stated in *Murphy:* 'Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.' 378 U.S. at 79, n. 18 [84 S.Ct. at 1609, n. 18]. This burden of proof, which we reaffirm as appropriate, is not limited to negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legit-

imate source wholly independent of the compelled testimony.

*Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1664.

Thus, in the case at hand, in order to sustain Hampton's indictment, the government had the burden of establishing that all of the evidence presented to the grand jury [34] (and ultimately all of the evidence to be utilized at trial) was derived from legitimate, independent sources. *Cf. United States v. Gregory,* 730 F.2d 692, 698 (11th Cir.1984), *cert. denied* — U.S. ——, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985). Although *Kastigar* notes that this is a "heavy" burden in practical terms, 406 U.S. at 461, 92 S.Ct. at 1665, subsequent cases controlling in this circuit have made it clear that, in legal terms, the government is only required "to demonstrate by a preponderance of the evidence an independent source for all evidence introduced." *United States v. Seiffert,* 501 F.2d 974, 982 (5th Cir.1974) (*"Seiffert II"*), *cited with approval* in *United States v. Gregory,* 730 F.2d at 698. Still, as recently noted by this panel in *United States v. Byrd,* 765 F.2d 1524, 1529 (11th Cir.1985), mere denials of use by the prosecutors and other government agents are generally insufficient to meet the government's burden, even if made in good faith. *Accord, United States v. Seiffert,* 463 F.2d 1089, 1092 (5th Cir. 1972) (*"Seiffert I"*); *United States v. Nemes,* 555 F.2d 51, 55 (2d Cir.1977). The *Kastigar* decision itself emphasized that a previously immunized defendant "is not dependent for the preservation of his rights upon the integrity and good faith of prosecuting authorities." 406 U.S. at 460. Moreover, the government's burden is not limited to such "negation of taint"; rather, the government must go further and af-

---

**34.** *Kastigar* and *Murphy* emphasize that, as a matter of constitutional imperative, "[state-immunized] testimony and its fruits may not be used *in any manner* by federal officials *in connection with a criminal prosecution*" against the previously-immunized witness. *Murphy,* 378 U.S. at 79, 84 S.Ct. at 1609 (emphasis supplied); *Kastigar,* 406 U.S. at 441, 92 S.Ct. 1653. In *United States v. Byrd,* 765 F.2d 1524, 1529–31 (11th Cir.1985), this Court interpreted *Murphy* and *Kastigar* to bar any direct or indirect *evi-*

*dentiary* use of immunized testimony or its fruits. This rule applies not only to evidentiary use of immunized testimony or its fruits at trial, but also to evidentiary use of immunized testimony or its fruits before an indicting grand jury. *See United States v. DeDiego,* 511 F.2d 818, 821 (D.C.Cir.1975); *United States v. Catalano,* 491 F.2d 268, 272 (2d Cir.1974). *Cf. United States v. Byrd,* 765 F.2d at 1528, n. 6; *United States v. Gregory,* 730 F.2d 692, 697 (11th Cir. 1984).

firmatively prove legitimate independent sources for its evidence and affirmatively establish that none of the evidence presented to the grand jury was derived directly *or indirectly* from the immunized testimony. *Kastigar*, 406 U.S. 453, 458–60, 92 S.Ct. at 1661, 1663–1665. *See also United States v. Byrd*, 765 F.2d at 1530.[35]

In the instant case, the government plainly did not carry its burden. Although the government argues (and the court below held) that the unimmunized statements of March 7 and March 12, 1979, constituted a legitimate independent source for all of the information contained in the subsequent immunized testimony, the record will not support such a finding. A review of the state investigators' summaries of Hampton's unimmunized statements, which constitute the only evidence available on this record of the contents of those statements, shows that several important matters and details discussed in the immunized testimony of November 5, 1979, and May 15, 1980, are not reflected in the statements from the preceding March. For instance, the November and May statements contain Hampton's first discussions of his contacts with Warren Musselwhite, "Sonny" Wilson, and "Hooker" Brown. Contacts with other key figures in the Bonita Springs investigation, including numerous real estate and property transactions with Cindy Laughlin, the girlfriend of Sonny Wilson who had ties to various other persons and property involved in the Bonita

Springs operation, are also discussed in detail for the first time in the immunized materials. In addition, as noted above, the immunized testimony contains the first references to the use of cashier's checks to purchase the house at 31 McGlaughlin Street,[36] an item of information that prosecutors appear to have used (for all that is discernible from the record) to build a case against Musselwhite, and information that may well have been utilized by state and federal officials as an investigatory lead in the case generally. These are just a few examples of the new information contained in the immunized testimony which may have furthered the state and the federal investigation.[37]

Nor was the evidence presented during the grand jury proceedings which culminated in Hampton's indictment limited to information revealed in the March 7 and March 12 statements. For instance, even aside from the new information revealed in the grand jury testimony of Warren Musselwhite, Agent Altif testified before the indicting grand jury on March 7, 1984, to the use of the cashier's checks in the purchase of the house at 31 McGlaughlin Street, the participation of "Sonny" Wilson and others in this transaction, and the fact that Hampton "handled" the sale of this residence.[38] Altif also testified that

> Bryant Hampton was involved in numerous transactions with Buddy Daniels and Sonny Wilson that extended from—

**35.** The Fifth Amendment, after all, is by its own terms an exclusionary rule of a very broad scope; therefore, when a previously immunized witness is prosecuted, the principles of that express constitutional exclusionary rule require not merely that evidence be excluded when such exclusion would deter wrongful police or prosecution conduct, but that the witness be left "in substantially the same position as if he had claimed the Fifth Amendment privilege." *See United States v. Kurzer*, 534 F.2d 511, 516 (2d Cir.1976), *quoting Kastigar*, 406 U.S. at 462, 92 S.Ct. at 1665. *Accord, United States v. Tantalo*, 680 F.2d 903, 908 (2d Cir.1982).

**36.** *See* Defendant's Exhibit 2, pp. 182, 203 (Hampton's immunized grand jury testimony of November 5, 1979); Government's Exhibit 3, pp. 22–23 (Hampton's immunized interview of May 15, 1980). *Compare* Government's Exhibit 1

(summary of Hampton's unimmunized testimony of March 7, 1979); Government's Exhibit 2 (summary of Hampton's unimmunized testimony of March 12, 1979).

**37.** These examples are not exhaustive of the facts and inferences deducible from Hampton's immunized testimony nor of the ways in which such testimony could conceivably have been used to obtain other information or evidence. Suffice it to say that the unimmunized statements cannot reasonably be deemed to be coextensive with the later immunized testimony in terms of the possible value of the latter in the state and federal investigations.

**38.** Exhibit 12P, pp. 4–5. Obviously, these facts could have been considered by the grand jury in connecting Hampton to the marijuana scheme.

beginning on October 17th of 1978 through January of 1979. The transactions consisted of the rental of various houses which were used as command posts and safe houses and in addition, the rental of one additional house known as the Stilt House, which was used to store marijuana.

Exhibit 12P, p. 6. Most of this information is not reflected at all in the summaries of Hampton's March 7 and March 12 statements. On the other hand, much of the information is discussed or implicated in one way or another in Hampton's later immunized testimony. Thus, although the court below seems to have based its ruling on the immunity issue solely on the finding that the unimmunized statements given by Hampton in March of 1979 constituted a legitimate and independent source for all of the evidence which may have been considered by the indicting grand jury, we must conclude on this record that this finding is clearly erroneous. Therefore, unless other legitimate, independent sources for all of the evidence presented to the indicting grand jury were established on the record, Hampton's motion to dismiss the indictment should have been granted.

The previously undisclosed information contained in Hampton's immunized testimony may well have been useful in furthering the state investigation.[39] Obviously the state thought Hampton's testimony useful, or else there would have been little need to take not one but two immunized statements in the course of the state investigation. Such information may also have been used directly by federal officials. Even if it were not,[40] the record contains ample evidence that federal agents relied heavily upon state investigative materials to further the federal investigation. The record is palpably inadequate to negate the clear probability that the state materials contained the *fruits* of Hampton's immunized testimony in addition to the immunized materials themselves. Since the federal authorities admittedly relied upon the state materials both to further the federal investigation[41] and in presenting the facts to the indicting grand jury,[42] it was incumbent upon the appellee in this case to demonstrate not only that Hampton's immunized testimony was not used by federal officials either directly or as an investigatory lead, but that any other information or materials conveyed by state officials and utilized either directly or indirectly by federal officials was not derived in whole or in part, directly or indirectly, from Hampton's immunized testimony.

The appellee in this case did not meet its burden. Indeed, aside from conclusory allegations of reliance upon the unimmunized statements of March 1979 and conclusory denials of use or derivative use by various state and federal officials, the government made little effort to affirmatively trace each item of evidence that may have been considered by the indicting grand jury to legitimate, wholly independent sources. Obviously, the government's conclusory denials of direct or derivative use are insufficient even to "negate taint," much less to carry the government's affirmative burden of tracing all evidence presented to wholly independent sources. *Cf. Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1664. And while the government did establish that state investigators knew certain aspects of some of the real estate transactions prior to any

---

**39.** The fact that Hampton's immunized testimony did not contain an admission of guilt or of knowledge that the transactions in which he was involved were tied in with a drug-smuggling operation does not establish that his immunized statements were without value in the federal investigation. Even denials of involvement in an illegal conspiracy contained in immunized statements do not preclude the possibility of improper use of immunized testimony. *Cf. United States v. Hinton*, 543 F.2d 1002, 1009 (2d Cir.1976), *cert. denied* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976).

**40.** As noted above, various federal agents and prosecutors who had access to the materials denied any use of the immunized testimony itself, albeit in a conclusory fashion insufficient to carry the government's burden under *Kastigar*.

**41.** *See, e.g.*, Vol. IV, pp. 83–85.

**42.** *See, e.g.*, Exhibit 12P at p. 6.

immunized testimony from Hampton,[43] there was no attempt to systematically establish an independent source for each and every item of evidence which may have been considered by the indicting grand jury, such as the relationship between Hampton and Wilson and the use of 23 cashier's checks purchased in fictitious names to cancel the source of the funds used to purchase one of the "stash" houses. Hampton's participation in such a questionable transaction, together with his relationship to Wilson, may well have been considered by the grand jury as evidence of his knowing involvement with the marijuana later found in the house at 31 McGlaughlin Street.[44] The government never attempted to trace step by step the manner in which Hampton's unimmunized statements supposedly led to such additional information.

Perhaps most importantly, the government made absolutely no attempt to establish that the testimony of Warren Musselwhite was obtained independently of Hampton's immunized testimony.[45] Where the testimony of an immunized witness enables the government to build a case against his co-conspirator, who consequently strikes a plea bargain with prosecutors and agrees to testify against the immunized witness, the testimony of the co-conspirator must be deemed to have been indirectly derived from the testimony of the immunized witness in violation of *Kastigar*. *See United States v. Kurzer*, 422 F.Supp. 487 (S.D.N.Y.1976). Were this not so, a witness whose testimony was compelled through a grant of immunity would not be left "in substantially the same position [vis-a-vis the government] as if the witness had claimed the Fifth Amendment privilege," and his Fifth Amendment rights would therefore be violated. *Kastigar*, 406 U.S. at 462, 92 S.Ct. at 1665. *See also Murphy v. Waterfront Commission*, 378 U.S. at 79, 84 S.Ct. at 1609; *United States v. Kurzer*, 534 F.2d 511, 516–17 (2d Cir. 1976).[46] Thus, in the instant case, if Hampton's immunized testimony *or its fruits* contributed directly or indirectly to the

**43.** For example, in the *Kastigar* hearing in the court below, the appellee established that, as evidenced by a report dated April 10, 1979, state investigator McQuinn knew prior to any immunized testimony the ownership of the residence at 31 McGlaughlin Street, the stilt house at Fishtrap Village, and the house at 1825 Tiller Terrace, which was also involved in the Bonita Springs investigation. *See* Government's Exhibit 5. *See also* Vol. V, pp. 66–67. The report also establishes that the government knew some aspects of Hampton's involvement in the sale or leasing of these properties. However, it does not comprise all of the information contained in the factual description of these transactions and the relationship of Hampton and his alleged co-conspirators as portrayed to the indicting grand jury by the government witnesses. The government made no specific showing on the record sufficient to establish that such additional information was derived by state or federal officials independently of Hampton's immunized testimony.

**44.** The indicting grand jury was told that Wilson financed the purchase of the residence at 31 McGlaughlin Street. *See* Exhibit 12N, p. 10.

**45.** Musselwhite's testimony before the indicting grand jury clearly included information not revealed in Hampton's unimmunized statements. As one example, Musselwhite testified that Hampton had actually helped Musselwhite, Wilson and others load marijuana for transporta-tion and distribution from the stash houses at 31 McGlaughlin Street and Fishcraft Village. *See* Exhibit 12M, pp. 18–19. AUSA Hinshelwood himself emphasized to the indicting grand jury the importance of this new information:

> Bryant Hampton .... was the realtor who had a series of transactions with this group of people, which in and of itself would not be a problem except that Mr. Musselwhite ... testified that in December of 1978, after that first load was brought in, Hampton assisted in the loading of the marijuana onto the vehicles provided by Musselwhite.

Exhibit 12N, p. 11. Thus, it was incumbent upon the government to establish that Musselwhite's testimony was not procured as a direct or indirect result of the leads or information obtained by federal or state officials through the knowledge and use of Hampton's immunized testimony.

**46.** *Cf. Pillsbury v. Conboy*, 459 U.S. 248, 264–71, 103 S.Ct. 608, 618–22, (Marshall, J. concurring), and 282–96, 103 S.Ct. at 627–34 (Stevens and O'Connor, JJ., dissenting) (use of immunized testimony as a basis for subsequent questions propounded to a witness constitutes impermissible derivative use of immunized testimony in prosecution of immunized witness). *Compare Pillsbury v. Conboy*, 459 U.S. at 257 n. 12, 103 S.Ct. at 614 n. 12 (majority opinion declining to reach issue).

government's case against Musselwhite, and thereby to Musselwhite's decision to plead guilty and testify against Hampton, then Musselwhite's testimony would not be derived independently of Hampton's immunized statements.

Unfortunately, aside from conclusory denials of use of Hampton's immunized testimony, the government made no effort in the court below to establish the independence of Musselwhite's testimony or to demonstrate the source of all of the evidence confronting Musselwhite at the time of the plea agreement. Moreover, although Musselwhite testified at the *Kastigar* hearing on behalf of the government,[47] he was not asked about what factors motivated him to accept the plea bargain. The record does indicate that immediately prior to the plea agreement, the federal prosecutors and investigative agents considered Hampton a valuable witness against Musselwhite,[48] and that AUSA O'Malley had reached a decision to seek a federal grant of immunity for Mr. Hampton in order to obtain his testimony against Musselwhite. By this time, federal authorities such as Agent Altif were familiar with the content of Hampton's immunized statements,[49] and thus familiar with testimony he could potentially provide in the prosecution of Musselwhite. In fact, the grand jury which was investigating Musselwhite and which ultimately indicted Hampton was actually told in January of 1984 that Hampton would be "appearing as a witness before the grand jury." (Exhibit 19, p. 12) (testimony of Agent Altif before grand jury on January 11, 1984). However, the record is silent as to what, if anything, Musselwhite knew or was told about the evidence Hampton was expected to provide against him. Similarly, although the record shows that government witnesses presented evidence and testimony in the various grand jury investigations of Musselwhite, portions of which could well have been derived directly or indirectly from Hampton's immunized testimony by state or federal investigators,[50] the appellee made no attempt at the *Kastigar* hearing in the court below to affirmatively trace its evidence against Musselwhite to identifiable independent sources. Thus, it is evident that the government has not carried its affirmative burden of establishing that Musselwhite's testimony was derived independently of Hampton's immunized testimony and its fruits.

Based upon a review of the entire record on appeal, and particularly the transcripts of the *Kastigar* hearing, it appears that the government labors under the misapprehension that it can satisfy its obligations under *Kastigar* merely by establishing independent sources for a portion of the evidence that may have been considered by the indicting grand jury and utilizing conclusory denials of use or derivative use mouthed by state and federal officials to fill in the numerous evidentiary holes that remain. We take this opportunity to disabuse the government of this faulty notion. *Kastigar* and its progeny require dismissal of an indictment of a previously immunized witness unless the government can demonstrate that "*none* of the evidence presented to the grand jury is derived, directly or indirectly, from the immunized testimony...." See *United States v. Byrd*, 765 F.2d at 1530 (emphasis supplied).[51] Moreover, neither speculation nor conclusory denials of use or derivative use by government officials will substitute for the affirmative showing of an independent source required for each and every item of evidence presented to the indicting grand jury. See *Byrd*, 765 F.2d at 1529; *United*

---

47. Vol. V, pp. 15–18.

48. *See, e.g.,* Vol. IV, pp. 162, 212–16; Government's Exhibit 4.

49. *See, e.g.,* Vol. IV, pp. 182–88.

50. *See, e.g.,* Exhibit 19, pp. 5, 8, 12 (testimony of Agent Altif concerning tracing of cashier's checks to Musselwhite as a result of state investigators).

51. Of course, as noted in Byrd, an indictment may be sustained despite the use of prohibited evidence if its use is found to have been harmless beyond a reasonable doubt. *Byrd*, 765 F.2d at 1529, n. 8. In the instant case, the government's showing at the *Kastigar* hearing is palpably inadequate to qualify for this narrow exception.

*States v. Seiffert,* 463 F.2d 1089, 1092 (5th Cir.1972) (*Seiffert I*). *See also Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1664. *Compare United States v. Gregory,* 730 F.2d 692, 697 n. 2 (11th Cir.1984) (specific independent sources adequately proven for some items of evidence, but not for others). Each step of the investigative chain by which the evidence presented was obtained must be documented or accounted for. The prosecutor who obtained the indictment may have never seen the immunized testimony and may believe in good faith that no one associated with the federal prosecution has utilized it, but that is not enough.

> Such a disclaimer does not preclude the possibility that someone who has seen the compelled testimony was thereby led to evidence that was furnished to federal investigators. Only by affirmatively proving that his evidence comes from sources independent of the immunized testimony can the prosecutor assure that the witness is in the same position he would have enjoyed had his self-incrimination privilege not been displaced by [a grant of] immunity.

*United States v. Nemes,* 555 F.2d 51, 55 (2d Cir.1977); *accord, United States v. Tantalo,* 680 F.2d 903, 908 (2d Cir.1982).

Even in the ordinary case, the government's affirmative burden under *Kastigar* is in practical terms a heavy one. *See Kastigar,* 406 U.S. at 461, 92 S.Ct. at 1665. Unless the government relies solely upon evidence obtained prior to the immunized testimony, *cf. United States v. Byrd, supra,* the principles of *Kastigar* generally require (as a practical matter) a showing that prosecuting officials and their agents were aware of the immunity problem and followed reliable procedures for segregating the immunized testimony and its fruits from officials pursuing any subsequent investigations. In the case at hand, no such showing was made, and the government's burden of affirmatively proving independent sources therefore appears to have

been virtually insurmountable. After all, the record clearly shows that state investigators obtained Hampton's immunized grand jury testimony in November of 1979, and continued to investigate the case and assimilate information for two years thereafter. Obviously the state investigators had no reason to segregate the immunized testimony during the course of their investigation or to be concerned about whether evidence obtained thereafter was derived from the immunized testimony, since Hampton enjoyed *transactional* immunity as far as the State of Florida was concerned. The record also shows beyond peradventure that when state investigators turned their complete investigative files over to federal authorities in mid-1981 and subsequently briefed federal officials on the information they had accumulated in the course of the state investigation, they neither informed federal officials that the investigation was predicated in part upon immunized testimony nor sought to differentiate between information learned or derived from Hampton's immunized testimony and other evidence derived from wholly independent sources.[52] Thereafter, numerous federal officials had access to Hampton's immunized statements and studied and used the state information and materials in furtherance of their own investigation for nearly three years, without even realizing that some of Hampton's statements were immunized, much less that some of the other evidence contained in the state files may have been derived directly or indirectly therefrom. In these circumstances, the prospect of tracing all of the evidence accumulated during the course of the investigation and used as investigatory leads to sources wholly independent of Hampton's immunized statements would seem unrealistic at best. Moreover, the statements of Agent Altif and other government officials to the effect that no direct or derivative use was made of such

---

52. In all likelihood, since state officials never sought to segregate Hampton's immunized testimony from other leads during the course of their actual investigation, it would have been all but impossible for them to determine some two

years later precisely what evidence had been derived from Hampton's testimony and what had not, even if it had occurred to them to do so.

statements, even aside from their legal insufficiency, must be viewed with considerable doubt given the peculiar history of this case.[53]

## CONCLUSION

One compelled through a grant of immunity to testify against himself has the legitimate expectation, engendered by the Fifth Amendment itself, that his testimony will not be used to obtain other evidence or testimony against him, and that he will not be prosecuted absent a clear demonstration that each item of evidence used to obtain his indictment is traceable to a legitimate, wholly independent source. Under *Kastigar*, the risk that misinformation, procedural inadvertence or the lapse of time will make it difficult or impossible to establish a completely independent source for all of the evidence presented to the indicting grand jury is a risk that falls upon the government, and not upon the previously immunized defendant. In this case, that risk has come home to roost. We conclude that the district court was clearly erroneous in finding that Hampton's unimmunized statements constituted an independent source for all of the evidence that may have been considered by the indicting grand jury. Our review of the record reveals no other basis on which to sustain the district court's ruling on the immunity is-

sue. We conclude that Hampton's motion to dismiss the indictment under the principles of *Kastigar* should have been granted. We therefore reverse the district court's ruling on this motion and remand to the district court. On remand, the district court shall vacate appellant's conviction and sentence and dismiss the indictment.[54]

REVERSED and REMANDED with instructions.

---

**53.** Even if such denials were made in good faith, there is in this context a substantial possibility (if not a strong likelihood) that the federal or state agents made some unknowing use of the immunized testimony (or its fruits) which they do not presently recollect. It is also worth noting that several of the federal investigators who clearly had direct or indirect access to the fruits of the state investigation, *see, e.g.,* Vol. IV, pp. 60–61 (federal Agent Al Monica and his partner), Vol. IV, pp. 53, 113–14 (IRS Agent Favis), and Vol. V, p. 37 (FBI Task Force Agent Moore, DEA Agent Cushing, DEA Agent Dugan, and certain other unnamed IRS Agents), did not testify at all at the *Kastigar* hearing in the court below as to the use they may have made of Hampton's immunized testimony or its fruits as conveyed to them by state investigators. Indeed, their possible knowledge and use of the immunized testimony is completely unaccounted for. Similarly, it does not appear that all state investigators who may have been exposed to the immunized testimony were present at the *Kastigar* hearing. All of this renders it even

more likely that portions of the evidence presented to the indicting grand jury, for which no legitimate independent sources have been affirmatively proved, may be traceable directly or indirectly to an investigatory use of Hampton's immunized testimony or its fruits. Given the breadth of exposure of federal investigators to presumptively tainted state information, the lack of contemporaneous knowledge of the *Kastigar* problem, and the absence of contemporaneous precautions against intentional or unintentional use of immunized materials in furtherance of the federal investigation, the task of legitimating all of the government's evidence after the fact would seem next to impossible.

**54.** The government had ample opportunity to attempt to satisfy its burden under *Kastigar* in the lengthy hearing in the court below. Given the peculiar circumstances of this case, our review of the record leads us to conclude that a remand for a further evidentiary hearing would be unwarranted if not futile.