UNITED STATES of America, Plaintiff–Appellee,

v.

William R. PALUMBO, Defendant–Appellant.

No. 89–1756.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 27, 1989.

Decided March 2, 1990.

Michael C. Carr, Asst. U.S. Atty., Benton, Ill., Robert T. Coleman, Asst. U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

John Zwerling, Zwerling, Mark, Sutherland, Ginsberg & Lieberman, New York City, for defendant-appellant.

Before CUDAHY and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Promises of immunity are important weapons in the fight against large-scale criminal enterprises; the government often snares big fish with information gained from little fish. In return, the little fish are granted immunity from prosecution based upon the information they provide to the government. The system works, however, only if each side keeps its end of the bargain: the informant must provide accurate information, and the government must not use that information against the informant. In this case, the informant charges that the government broke its promise by using immunized information to indict him.

### I.

In 1986, federal and state law enforcement officials began investigating the importation and distribution of large marijuana shipments in San Francisco and New Orleans. By January 1987, federal prosecutors had obtained indictments against ten individuals for various drug offenses. Some of those indicted talked to the government about the drug operation: James Blair told FBI Agent Robert Dueker that William Palumbo operated gates at a San Francisco shipyard so that trucks could enter and exit the dock, and that Palumbo remained on the site during the actual unloading of the ships; Jeffrey Tuchband confirmed that Palumbo operated the shipyard. Others said that Palumbo established a shipyard in New Orleans where loads of marijuana were imported into this country.

To begin a personal investigation of these charges, IRS agent Charles Quarenghy flew to New Orleans and, by interviewing Palumbo's business associates and employees, learned that Palumbo leased the dock in 1984 on behalf of two companies. Further, Quarenghy learned that Palumbo paid an unusually high price for the lease. Quarenghy also examined two corporations established by Palumbo and discovered that no tax documents had ever been filed on their behalf. He concluded that Palumbo established these corporations as a "front" for a marijuana importation conspiracy. As a result, he and other agents obtained subpoenas for Palumbo's credit card transactions, his bank statements, his telephone records and various other business records.

In October 1987, two of Palumbo's attorneys arranged to meet with Assistant United States Attorney Michael Carr (of the Southern District of Illinois), FBI Agent Dueker and other federal and state officials about the investigation. The attorneys refused to divulge the name of their client, stating only that they represented an individual who had "inadvertently got involved in this matter [and] wanted to come forth and set the record straight concerning his involvement." Appellee's Brief at 14. The attorneys explained that

> their client had been used by the conspiracy leaders to form a company, rent a ship yard, and legitimately operate the company without ever knowing that these actions were in furtherance of a marijuana scheme ... their client later became suspicious of the leaders, and when he finally confronted them he was

told that his activities had been part of a marijuana conspiracy.

Appellant's Brief at 3. At this point, Agent Dueker asked the attorneys if they were talking about Palumbo; they acknowledged that they were.

Interested in Palumbo's testimony, Assistant United States Attorney Carr told the attorneys that Palumbo would have to make a proffer—to demonstrate the truthfulness and relevance of his information—before he could engage in any plea negotiations. Carr offered Palumbo informal use and derivative use immunity for his proffer, tantamount to the protections provided by 18 U.S.C. section 6002. Further, Carr agreed not to reveal the existence of the proffer (or its source) if the parties could not reach a plea agreement.[1]

Palumbo appeared with his attorneys in the Southern District of Illinois to answer questions posed by law enforcement agents involved in the investigation. Palumbo told the agents that "when he originally made arrangements for the San Francisco barge he did not know about the marijuana on board," but that he later became suspicious (and involved) when George Brock gave him $100,000 to keep quiet. Memorandum and Order at 3 (June 27, 1988) (*Kastigar* hearing). At the conclusion of the proffer, Agent Dueker contacted Assistant United States Attorney Carr and, without revealing any specific facts about the proffer, told him that Palumbo had provided a truthful account. Still, Palumbo's attorneys and Carr were unable to negotiate a plea agreement.

Less than one month later, Palumbo and his attorneys were surprised to learn that Eugene Fischer, one of the individuals Palumbo fingered in his proffer, had been arrested in Florida pursuant to a warrant obtained in the Southern District of Illinois. They were even more shocked to discover, however, that FBI Agent Davis testified at Fischer's detention hearing and, despite the agreement not to disclose material facts about Palumbo's proffer, revealed the substance of the proffer. Davis also disclosed the source of the proffer: "We received that information from an individual named William Columbo [sic]." Memorandum and Order at 3 (June 30, 1988) (severance hearing). At this time, all negotiations between Palumbo and the government broke off.

On November 25, 1987, Agent Dueker testified about Palumbo before a grand jury in the Southern District of Illinois:

Q. You've mentioned William R. Palumbo and he is a new name mentioned in Count Two of the proposed indictment which is the conspiracy to distribute more than a thousand pounds of marijuana charge. Mr. Palumbo's involvement according to your investigation was what?

A. Mr. Palumbo was used by Mr. Brock and Mr. Fischer in San Francisco in 1984. That's the first time Mr. Palumbo became involved. He assisted them by locating a shipyard in San Francisco which was used to unload the hundred sixty-five thousand pounds of marijuana which came in in April of 1985.

He worked for them initially, he was not knowledgeable of what was going on but after observing what had been transpiring, he became suspicious and according to the cooperating witnesses Mr. Palumbo became aware that marijuana was involved in the transaction in San Francisco in 1984. He was again used in 1985 to set up the shipyard in New Orleans which was used to bring in the load in April of 1985.

Transcript of Grand Jury Testimony at 17–18 (Nov. 25, 1987). The Grand Jury indicted Palumbo that same day.

Palumbo, alleging that the government breached its promise not to use information gained from the proffer against him, timely

---

1. In its brief, the government argues: "Palumbo claims that the government promised not to reveal that [sic] fact that he had made a proffer. The government disputes this assertion but offered no evidence to rebut it claiming that it was irrelevant to the *Kastigar* issue and the court agreed." Appellee's Brief at 15 n. 3.

While it is true that the district court ignored the issue in its *Kastigar* ruling, the district court found, in a later order severing the trial, that "[i]t is also clear that the government breached its agreement not to reveal the fact of the proffer." Memorandum and Order at 2 (June 30, 1988) (severance hearing).

filed a motion for a *Kastigar* hearing.[2] After the hearing, the district court denied Palumbo's Motion to Dismiss (and his motion to bar the use of certain evidence) because, in its opinion, "[t]he government clearly established [its] knowledge of Palumbo's involvement prior to the proffer." Memorandum and Order at 3 (June 27, 1988) (*Kastigar* hearing). Three days later, however, the district court, relying on the government's breach in Florida of its additional promise not to divulge the source of the proffer, granted Palumbo's motion to sever his trial from the trial of his co-defendants. Palumbo attempted to appeal the district court's *Kastigar* ruling refusing to dismiss the indictment directly to us, but we dismissed for lack of jurisdiction. Palumbo then pled guilty to violations of 21 U.S.C. section 846 (conspiracy to distribute marijuana) and 26 U.S.C. section 7201 (tax evasion), but specifically reserved his right to appeal the district court's decision on the *Kastigar* motion pursuant to Fed.R.Crim.P. 11(a)(2).[3] The district court sentenced him to twelve years imprisonment. Palumbo appeals the district court's decision.

## II.

In *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court considered whether prosecutors could compel certain testimony "by granting immunity from the use of compelled testimony and evidence derived therefrom ('use and derivative use immunity')" without violating an individual's Fifth Amendment privilege against compulsory self-incrimination. *Id.* at 443, 92 S.Ct. at 1655. After reviewing the historical underpinnings of immunity statutes in conjunction with the Fifth Amendment, the Court held that use and derivative use immunity "is coextensive with the scope of the privilege against self-incrimination, and there-

fore is sufficient to compel testimony over a claim of the privilege." *Id.* at 453, 92 S.Ct. at 1661. The Court went on to say, however, that individuals testifying under a grant of immunity (pursuant to 18 U.S.C. § 6002) need not rely solely on the government's promises and good intentions to use the statement properly:

> "Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." [*Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 1609 n. 18, 12 L.Ed.2d 678 (1964)] ... *This burden of proof, which we reaffirm as appropriate, is not limited to the negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.*

406 U.S. at 460, 92 S.Ct. at 1664 (emphasis supplied).

■ There is no question that the provisions of *Kastigar* are implicated by this case. The parties do not dispute that Palumbo received informal use and derivative use immunity for his October 13, 1987 proffer. Such grants of immunity are fully enforceable. *See, e.g., United States v. Williams*, 809 F.2d 1072, 1081–82 (5th Cir.), *on rehearing*, 817 F.2d 1136, 1138 (5th Cir.), *cert. denied*, 484 U.S. 896, 108 S.Ct. 228, 98 L.Ed.2d 187 (1987); *United States v. Society of Indep. Gasoline Marketers of Am.*, 624 F.2d 461, 469–74 (4th Cir.1979), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 859, 66 L.Ed.2d 801 (1981); *United States v. Kurzer*, 534 F.2d 511, 513 (2d Cir.1976).

**2.** *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). This case is discussed *infra*, Section II.

**3.** Rule 11(a)(2) provides:
   **Conditional Pleas.** With the approval of the court and the consent of the government, a defendant may enter a conditional plea of

guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review the adverse determination of any specified pre-trial motion. A defendant who prevails on appeal shall be allowed to withdraw the plea.

And the logic of *Kastigar*—that 18 U.S.C. section 6002 should be sufficiently broad to protect an individual from being compelled to testify against himself—applies to grand jury proceedings as well as to trials. *See, e.g., Kastigar,* 406 U.S. at 461, 92 S.Ct. at 1665 ("... the compelled testimony can in no way lead to the infliction of criminal penalties...."); *United States v. Garrett,* 797 F.2d 656, 664 (8th Cir.1986) (government must not present immunized statements to grand jury); *United States v. Zielezinski,* 740 F.2d 727, 733 (9th Cir.1984) ("We cannot permit convictions to stand where indictments are tainted...."); *United States v. Gregory,* 730 F.2d 692, 697 (11th Cir.1984) ("Section 6002 speaks to use of the immunized testimony in 'any criminal case,' and thus prohibits its use in the grand jury proceedings as well as at trial."), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985).

■ Since the informal grant of immunity triggers *Kastigar,* the government carries "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Kastigar,* 406 U.S. at 461–62, 92 S.Ct. at 1665. The government must make a "strict showing" that the indictment was obtained independent of Palumbo's proffer. *United States v. Brimberry,* 744 F.2d 580, 587 (7th Cir.1984), *cert. denied,* 481 U.S. 1039, 107 S.Ct. 1977, 95 L.Ed.2d 817 (1987). At the *Kastigar* hearing, the government attempted to make this showing by presenting the evidence it allegedly used to obtain the indictment against Palumbo. Government witnesses testified in district court that several "cooperating witnesses" had told them that Palumbo was present on the San Francisco and New Orleans docks when the marijuana was delivered. And the government explained that it had subpoenaed Palumbo's drivers license, bank account records, credit card account records, phone records and other business records before its agents were contacted by Palumbo's attorneys for the initial meeting. Indeed, Palumbo's involvement "was so well-established," argued the government, "that at the initial meeting to set up the proffer, Agent Dueker identified Palumbo

to his attorneys after they began describing his involvement, but prior to their revealing his identity." Memorandum and Order at 9 (July 27, 1988) (*Kastigar* hearing). The district court accepted the government's proof as sufficient to demonstrate that the indictment had been obtained on evidence wholly independent of the proffered statement: "The government clearly established [its] knowledge of Palumbo's involvement prior to his proffer." *Id.* at 3.

There is little question, we believe, that the government had ample evidence—apart from the proffer—demonstrating that Palumbo *was involved* in operations relating to the marijuana distribution scheme. The more difficult question, however, is whether the government demonstrated that Palumbo *knew* he was involved in marijuana operations; that is, whether he possessed the requisite *mens rea* to be guilty of conspiracy to distribute marijuana or tax evasion. To demonstrate Palumbo's knowledge of his participation, Agent Dueker told the grand jury that

> He [Palumbo] worked for them initially, he was not knowledgeable of what was going on but after observing what had been transpiring, he became suspicious and according to the cooperating witnesses Mr. Palumbo became aware that marijuana was involved in the transaction in San Francisco in 1984. He was again used in 1985 to set up the shipyard in New Orleans which was used to bring in the load in April of 1985.

Transcript of Grand Jury Testimony at 17–18 (Nov. 25, 1987).

But where did Agent Dueker get this information? Agent Dueker was asked this question at the *Kastigar* hearing and he responded:

> Prior to Mr. Palumbo's proffer on October 13, I received information concerning that [Palumbo's knowledge of the scheme] from the attorneys that came and represented to us they had an unknown individual who had gotten involved, not knowingly, but later found out that was going on. That would be

Mr. Marks and Mr. English [Palumbo's attorneys].

. . . . .

I had also been told by Mr. Blair in September of 1987, that in his conversations with Brock, that Brock was real big on getting individuals to do things for him which were illegal in which the individuals did not know about it, but if they became aware of it later, he would pay them off. Blair cited the example of the crane operator in New Orleans that, Mr. Crabtree, that was used to unload the containers which were filled with marijuana which he, when he unloaded them, thought were filled with cement.

Transcript of *Kastigar* Hearing at 978–79 (May 25, 27, June 1, 2, 1988).

Certainly, the statements made by Palumbo's attorneys to the FBI could not properly be the source of the government's information. *See* Fed.R.Crim.Pro. 11. Nor could Agent Dueker's knowledge of Brock's general propensity to "dupe" people prove that Palumbo learned that he had been "duped." And, although one might have inferred Palumbo's involvement from credit card receipts, bank statements and business records, Agent Dueker did not tell the grand jury that he in fact had inferred Palumbo's knowledge from this information.[4] Instead, he simply announced in a conclusory fashion to the grand jury that Palumbo knew about the marijuana scheme.

The government, in its brief, offers only one other statement demonstrating that it had independent evidence of Palumbo's knowledge: "Both Tuchband and Blair specifically had told of Palumbo's *knowledge* and presence at the site while the marihuana [sic] was being unloaded." Appellee's Brief at 22 (emphasis supplied). Unfortu-nately, however, the government neglected to support this assertion with a citation to the record or to the proceedings below. As a result, the panel asked the government at oral argument for a citation in support: the government responded at the conclusion of oral argument by citing page 857 of the record. But that page proves only that Palumbo was *involved* in a marijuana scheme, not that he *knew* he was involved: "We learned that Doc Palumbo was *involved* in the 1984 San Francisco, California load. We also learned that he was *involved* in the 1985 marijuana load, which was brought into New Orleans, Louisiana." Record at 857 (emphasis supplied). Our search through the record reveals no basis for an independent source of information that Palumbo knew he was involved in the scheme. More important, the government did not present any information to the grand jury—other than that based on Palumbo's immunized statement—that Palumbo at any time knew he was participating in a conspiracy to distribute marijuana.

If the government had presented evidence to the grand jury that Palumbo actually saw identifiable marijuana being unloaded onto the docks, or that he smelled each load to ensure that the packages contained marijuana (and not cement), or that he bragged to co-workers about the profitability of his marijuana business, the government might now reasonably claim that it did not rely upon Palumbo's immunized proffer to obtain an indictment against him. All that the government has presented in this prosecution to prove knowledge, however, is the proffer itself.[5] We conclude, therefore, that the government has failed to satisfy its *Kastigar* burden of demonstrating affirmatively that the evidence it used to obtain an indictment against Palumbo was "derived from a legit-

---

4. The likelihood of the grand jury drawing such an inference is questionable; indeed, FBI Agent Dueker admitted during the *Kastigar* hearing that Mr. Crabtree, the crane operator who had been "duped" into unloading containers that he thought were filled with cement, *never* learned that they were actually filled with marijuana. Transcript of *Kastigar* Hearing at 979 (May 25, 27, June 1, 2, 1988).

5. We find it more than a little suggestive that Agent Dueker told the grand jury that Palumbo did not know he was participating in a marijuana conspiracy until some time after its inception; this is precisely the information Palumbo gave to the FBI in his proffer. Apart from Agent Dueker's reliance on Brock's general ability to "dupe" people, the government presents no independent support for Palumbo's knowledge.

imate source wholly independent of the compelled testimony." *Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1664.

Since the government has not demonstrated affirmatively that the evidence presented was derived from independent sources, the indictment must be dismissed.[6] *See, e.g., United States v. Garrett,* 797 F.2d 656, 665 (8th Cir.1986) (government must present wholly independent evidence to grand jury; otherwise indictment must be quashed); *United States v. Hampton,* 775 F.2d 1479, 1489 (11th Cir.1985) (*"Kastigar* and its progeny require dismissal of an indictment of a previously immunized witness unless the government can demonstrate that *'none* of the evidence presented to the grand jury is derived, directly or indirectly, from the immunized testimony....' ") (emphasis in original); *United States v. Tormos–Vega,* 656 F.Supp. 1525, 1536 (D.P.R.1987) ("[W]hen evidence derived from an immunized testimony is used to obtain an indictment against the immunized witness, the proper remedy lies in dismissal of the indictment."), *aff'd,* 843 F.2d 1384 (1st Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 129, 102 L.Ed.2d 102 (1988). We have earlier written that "agreement[s] made by the government must be scrupulously performed and kept." *United States v. Brimberry,* 744 F.2d at 587. The government has not kept its end of the bargain. We therefore order that the indictment filed against William Palumbo be dismissed.

### III.

Palumbo asks that we disqualify Assistant United States Attorney Carr from potential future prosecutions[7] relating to this case because Carr is now intimately familiar with the substance of Palumbo's immunized proffer. As a result, Palumbo argues, any attempt to obtain another indictment against him in which Carr is involved would inevitably be based, in some way, on the immunized proffer. In support of his request to disqualify Carr, Palumbo cites several cases imposing stringent requirements on prosecutors who have become privy to immunized testimony. *See, e.g., United States v. Byrd,* 765 F.2d 1524, 1532 n. 11 (11th Cir.1985) ("[I]t would be unwise to permit an attorney familiar with the immunized testimony to participate in the trial or preparation of the case."); *United States v. Semkiw,* 712 F.2d 891, 895 (3d Cir.1983) (government must prove that prosecutor did not rely upon immunized testimony).

■ While we appreciate Palumbo's position, we are unwilling to disqualify Assistant United States Attorney Carr from future proceedings relating to this case. Such an approach is neither demanded by our caselaw nor necessary to protect Palumbo's due process rights: *Kastigar* already requires the government to shoulder the heavy burden "of proving that all of the evidence it proposes to use was derived from legitimate independent sources." 406 U.S. at 461–62, 92 S.Ct. at 1665. If Assistant United States Attorney Carr pursues another indictment in this case, he will have to demonstrate that the evidence used to obtain the indictment was derived from independent sources. Should he be unable to make this affirmative showing, the court will again dismiss the indictment. True enough, in order to avoid the use of immunized testimony (as well as the appearance of taint), it may be wise for the government to ask another attorney to take over this case. But that is the government's decision to make, not ours.

**6.** Some courts have sustained indictments when the government demonstrates beyond a reasonable doubt that the introduction of the prohibited evidence was harmless. *See, e.g., United States v. Hampton,* 775 F.2d 1479, 1489 n. 51 (11th Cir.1985); *United States v. Gregory,* 730 F.2d 692, 698 (11th Cir.1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985). We need not reach that question here: since we have determined that Palumbo's proffer was the only direct evidence of his knowledge of the conspiracy, its presentation to the grand jury certainly was incriminating under any standard.

**7.** Counsel for Palumbo acknowledged at oral argument that "he [Palumbo] could be reindicted as long as they [the government attorneys] did not use, directly or indirectly, the fruits of his proffer."

## IV.

The only evidence clearly demonstrating that Palumbo *with full knowledge* participated in the conspiracy to distribute marijuana came from Palumbo's own mouth. The government promised that it would not use this information against him but did so anyway. We will not tolerate these abuses of Palumbo's *Kastigar* rights. We therefore reverse the district court's ruling on the *Kastigar* motion and remand the case to the district court. On remand, the district court should vacate Palumbo's conviction, allow him to withdraw his plea, dismiss the indictment against him and take other appropriate action not inconsistent with this opinion.

REVERSED AND REMANDED WITH INSTRUCTIONS.