**File Name: 14a0849n.06**

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**NO. 13-2220**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 12, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT |
| v. | ) | FOR THE WESTERN DISTRICT |
| | ) | OF MICHIGAN |
| LANCE DALE LAIRD, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

**BEFORE: McKEAGUE and GRIFFIN, Circuit Judges; and POLSTER, District Judge.**[*]

**POLSTER, District Judge.** Lance Dale Laird, who was convicted by a jury of conspiracy to possess with the intent to distribute 500 grams or more of cocaine, appeals his conviction based solely on the claim that he was denied constitutionally effective trial counsel. Because we generally decline to review ineffective-assistance claims on direct appeal and because the record is not fully developed, we affirm the conviction but decline to entertain the ineffective assistance claim on direct appeal.

**I.**

In a criminal complaint filed on January 25, 2013, Lance Laird, along with seven others, was charged with conspiracy to possess with the intent to distribute 500 grams or more of cocaine. The

_____

[*]The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

complaint, signed by Nathan Osborn, a veteran Lansing, Michigan police officer who was assigned to Tri-County Metro Narcotics, was based on the following underlying facts.

In November 2012, Officer Osborn had contact with a confidential informant ("CI") who provided information regarding narcotics trafficking in Lansing, Michigan. Specifically, he had information about a man identified as Juan Guerrero, Jr. smuggling large amounts of cocaine, heroin, crystal meth and marijuana in Lansing. The CI stated that Guerrero's associate, Ray (later determined to be Gonzalo Ramon Delarosa), was also involved in drug smuggling.

On January 18, 2013, the CI informed Officer Osborn that Guerrero was leaving for Texas that day to pick up drugs and bring them back to Michigan to sell. Officer Osborn successfully filed an application for a pen register for a cell phone which he gave to the CI who, in turn, gave the phone to Guerrero prior to leaving for Texas. The purpose of the cell phone was to track Guerrero's movement to and from Texas.

Visual surveillance showed Guerrero leaving his residence in a white Chevy Tahoe on January 18, 2013 and arriving at the residence of Ray Delarosa, who left the residence in a black Pontiac Grand Prix. The two vehicles were followed to the City of Jackson, where visual surveillance was discontinued.

Electronic surveillance tracked the phone to Texas. FBI agents in Texas were contacted and conducted visual surveillance of the subjects in Texas. An agent photographed Lance Laird standing next to the Grand Prix at the Super 8 Motel in Weslaco, Texas on January 21, 2013. Tri-County Metro Narcotics received information that a tan GMC Yukon was observed in Texas by local law enforcement.

2

The phone was electronically monitored traveling from Texas to Indiana where the Grand Prix was observed traveling north on I-465. The Grand Prix left the interstate at Exit 95 and proceeded to a Pilot gas station. While at the Pilot gas station, Tri-County Metro Narcotics surveillance observed the occupants of the Grand Prix meeting up with persons in the tan GMC Yukon and a white pickup truck. All three vehicles were observed leaving the station at the same time and entering I-465 traveling north. The vehicles were kept under constant visual surveillance and were seen driving in tandem from Exit 95 on I-465 to Michigan via I-69. The vehicles were all observed leaving Exit 278 off I-69 and proceeding to a McDonald's restaurant where they were observed sitting together. They were kept under surveillance until traffic stops were coordinated by the Michigan State Police.[1]

The Grand Prix was last in the line of the three vehicles and the first vehicle stopped in Michigan. Laird was driving the vehicle and his passenger was Juan Guerrero, Jr. The second vehicle stopped was the white pickup truck, driven by Julio Cruz Pizano with passengers Ryan Joshua Nice and Robert Villareal. Prior to the white pickup being stopped, a Michigan State Trooper attempted to pass it to stop the Yukon. The white truck, acting as a "bait" vehicle, swerved into the middle of the road at the passing Trooper in an effort to divert the Trooper's attention from the "load" vehicle, or Yukon. Meanwhile, the Yukon, which had been driving 30 to 35 mph due to hazardous snow and ice conditions, began driving at over 60 mph in an attempt to elude officers, but

---

[1]In the criminal complaint, Officer Osborn averred that he knew, through his training and experience as a law enforcement officer, that narcotics traffickers will often travel in groups in an attempt to avoid being stopped by law enforcement. The traffickers will often have a "load" vehicle, which carries the narcotics, and "bait" vehicles which attempt to block law enforcement officers from stopping the load vehicle by committing some type of offense that draws the attention of the officer away from the load vehicle.

eventually pulled over. The Yukon was driven by Ray Delarosa and carried Robert Villareal's mother (Genoveva Pizano Villareal) and brother (Abel Villarreal). During a subsequent search of the Yukon, officers located approximately 4.5 kilograms of powder cocaine inside a spare tire that was attached to the vehicle's underbody.

As a result of the investigation, the government filed a criminal complaint on January 25, 2013, charging the eight persons traveling from Texas to Michigan in the three vehicles with conspiring to traffic cocaine. On January 28, 2013, the Court appointed an Assistant Federal Public Defender to represent Laird. One day later, Attorney Ina R. O'Briant filed an appearance as retained counsel on Laird's behalf.

On January 29, 2013, Laird made a detailed off-the-record proffer. The agreement that Attorney O'Briant and Laird reviewed and signed prior to his proffer required him to be truthful, to not withhold any material or requested information to protect himself or others, and to tell all he knew about any criminal activity in which he had participated or of which he had information and knowledge. The agreement reflected the parties' understanding that it was not until *after* the off-the-record proffer was made, and the government evaluated the information provided, that the government would contact Laird concerning whether or not a plea agreement could be reached and what concessions or recommendations, if any, the U.S. Attorney would be willing to make on his behalf.

The substance of Laird's proffer was placed on the record by the government at a March 26, 2013 hearing. Laird admitted driving from Michigan to Texas with co-defendants Guerrero and Delarosa in a black Grand Prix to pick up approximately $100,000 worth of marijuana. When they arrived and examined the marijuana, Laird advised against purchasing it because it was covered with

4

mold. They then set up a deal to purchase 2.5 bricks of cocaine in Brownsville, Texas. Delarosa and co-defendant Robert Villareal talked about the price of the cocaine being $25,000 per kilogram. They picked up the cocaine and brought it back to the hotel, went to a tire shop to purchase a tire, and then broke down the tire and hid the cocaine inside. Laird described how they first left the hotel, with Laird, Guerrero and Delarosa in the Grand Prix; Villareal and his mother in the Yukon GMC; and co-defendants Pizano, Nice and Abel Villareal in the pickup truck. Laird described how some of them were pulled over by the police on the way back to Michigan, and later caught back up with group.

In an email sent to Attorney O'Briant on February 21, 2013, the Assistant U.S. Attorney advised her that Laird "was not fully forthcoming in his proffer," and declined to offer him a plea agreement at that time. A few days later, O'Briant left on a three-week vacation. The record does not show whether O'Briant conveyed the contents of the email to Laird or whether they had any discussion as to how Laird might supplement his proffer.

At a pretrial hearing on March 14, 2013, the Court continued the trial from April 9, 2013 to May 7, 2013. Laird thereafter filed several pretrial motions. At the March 26, 2013 hearing on Laird's motion for a bill of particulars, the government detailed Laird's proffer and explained what he needed to admit in order to make a complete proffer (i.e., that he was the one who carried the cocaine in a backpack on foot around the Hebbronville, Texas security checkpoint). The record does not show what, if any, discussion O'Briant had with Laird following this hearing or whether she advised him on how he might supplement his proffer to advance plea discussions or effectuate a plea bargain.

5

Laird was the only defendant to proceed to trial. By that time, Robert Villareal's mother and brother had been dismissed from the case and the remaining five defendants had entered guilty pleas. At trial, the government presented Officer Osborn who testified about his relationship with the CI and his investigation, three law enforcement officers involved in stopping the three vehicles in Michigan, the FBI agent who conducted visual surveillance in Texas and took pictures of Laird outside the Weslaco, Texas motel, and three co-defendants who testified in detail about the trip to Texas to purchase drugs, and about Laird hiking the drugs in a backpack around the checkpoint in Texas.

After the government rested its case mid-day on the third day of trial, the Court recessed the jury to ask Attorney O'Briant if she intended to present any witnesses or rest her case. She explained that one of her witnesses, a social worker, was in the hospital having had a baby the day before. O'Briant explained that the social worker would have testified that she had contacted Laird on the way to Texas to tell him that he needed to return to Michigan as soon as possible because Child Protective Services was going to remove his daughter from her mother's custody. The court noted that Laird did not have to be along for the entire ride to be part of the conspiracy. When the court asked O'Briant if she had any other witnesses, O'Briant said that she had subpoenaed Laird's uncle to testify but did not realize the government would finish its case that day, and so told him that he did not need to show up. When asked about Laird's uncle's testimony, O'Briant stated that he would testify about Laird's relationship with Delarosa and that he would testify about things Laird had told him. The judge explained to O'Briant that witnesses often have to sit outside the courtroom until they are needed, the uncle's hearsay testimony would be inadmissible, and he could not see how the proffered evidence would bear on Laird's defense in any meaningful way. He then called

6

the jury back and informed them that Laird had decided to rest on the presumption of innocence without presenting evidence. The jury thereafter convicted Laird of the conspiracy charge after deliberating less than one hour.

Attorney O'Briant filed a motion for a new trial in which she blamed the court and prosecutor for depriving her of the ability to provide effective assistance of counsel. The trial judge promptly denied it, finding that the motion was premised "on demonstrably false statements of fact" and observing that O'Briant made no references whatsoever to the trial transcript.

O'Briant also filed a motion to withdraw. At the hearing on this motion, O'Briant testified that Laird was dissatisfied with her performance and wanted to bring an ineffective assistance claim against her, but acknowledged that she was not the proper person to bring that claim on Laird's behalf. More importantly, O'Briant admitted that she neither interviewed, nor attempted to interview, any of the 17 persons she identified on her witness list, she did not conduct any kind of investigation prior to trial, and she only took the case because she thought it was going to be resolved through a plea bargain. She testified that, had she known the case was going to trial, she probably would not have taken it. She testified that she didn't generally "do federal criminal matters" and that Laird was "paying a price for that." She admitted that her three-week vacation prior to trial left her no time to adequately educate herself on the law and the facts, and caused her to file untimely motions and miss important deadlines, and rendered her incapable of presenting her witnesses at trial. The court agreed it was apparent that O'Briant was "in over her head." Accordingly, the court granted the motion to withdraw and appointed Attorney Richard Zambon to represent Laird for sentencing. On September 10, 2013, Laird was sentenced to 135 months in prison.

## II.

On appeal, Laird contends that the record is sufficiently developed for us to rule on his ineffective assistance claim on the merits. This is due to O'Briant's on-the-record admission that she conducted no pretrial investigation of witnesses or evidence because she expected the case against Laird to result in a plea bargain, and due to O'Briant's failure to effectively pursue a plea bargain. The government maintains that the record is not sufficiently developed for Laird to bring an ineffective asssitance claim but contends that if we rule on the merits, the claim should be denied.

The Sixth Amendment to the Constitution guarantees the effective assistance of counsel to criminal defendants. *Strickland v. Washington*, 466 U.S. 668 (1984). Ineffective assistance claims are evaluated pursuant to the two-prong test articulated in *Strickland*. 466 U.S. at 687. To prove that counsel was constitutionally ineffective, a defendant must show that (1) counsel's performance was deficient, and (2) the deficiency resulted in prejudice. *Id.*

"Ordinarily, this court declines to review ineffective assistance of counsel claims on direct appeal." *United States v. Henderson*, 174 F.App'x 880, 885 (6th Cir. 2006) (citing *United States v. Galloway*, 316 F.3d 624, 634 (6th Cir. 2003) and *United States v. Shabazz*, 263 F.3d 603, 612 (6th Cir. 2001)). "This rule stems from the lack of a sufficient record to evaluate such a claim on direct appeal given the requirement that the defendant show prejudice to succeed on such a claim." *Henderson*, 174 F.App'x at 885 (citing *Galloway*, 316 F.3d at 634). "As a result, unless the record is adequate to permit a review of counsel's performance on direct appeal, this court usually requires that an ineffective assistance claim be brought through a post-conviction proceeding under 28 U.S.C. § 2255. *Id.* "An exception may be drawn where the record on direct appeal is sufficiently developed." *United States v. Woodruff*, 735 F.3d 445, 451 (6th Cir. 2013). However, "[w]here the

8

record is silent as to counsel's reasons for his action or inaction, this court 'cannot determine whether his actions reflected a reasoned trial strategy' and cannot adjudicate the question of whether he rendered ineffective assistance." *United States v. Caldwell*, 555 F.App'x 597, 598 (6th Cir. 2014) (quoting *United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006)).

"It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 supp.)). "The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty." *Id*. Furthermore, "counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary*." *Cauthern v. Colson*, 736 F.3d 465, 485 (6th Cir. 2013) (quoting *Strickland*, 466 U.S. at 690-91) (emphasis added)). "Even when counsel's decision not to investigate is inadequately informed, a defendant must show that counsel's 'strategic decision . . . not to investigate fully the law and facts possibly relevant to the defense was [not] a 'reasonable professional judgment.'" *Shopteese v. Waddington,*, 530 F.App'x 762 (10th Cir. 2005) (quoting *Attorney Gen. of Kan.*, 425 F.3d 853, 859 (10th Cir. 2005), in turn quoting *Strickland*, 466 U.S. at 690-91).

The record shows that O'Briant's failure to conduct a pretrial investigation was not the result of a reasoned professional judgment and had nothing to do with trial strategy. *See United States v. Holder*, 410 F.3d 651, 655 (10th Cir. 2005) ("[I]t is the *informed tactical* decision that is within counsel's discretion.") (emphasis in original). O'Briant admitted that she failed to interview any witnesses (including the ones she subpoenaed) or conduct any investigation because she expected

9

the case to result in a plea deal. She testified that she didn't generally handle federal criminal matters, and admitted that her three-week vacation prior to trial left her no time to adequately educate herself on the law and the facts of the case.

A defense counsel's self-confessed admission of deficient representation does not constitute ineffectiveness *per se*; it is just one factor to be considered in determining whether counsel was constitutionally ineffective. The person asserting an ineffective assistance claim for failure to investigate must show that the failure was prejudicial. *Davis v. Booker*, 589 F.3d 302, 306-07 (6th Cir. 2009).

Although Laird complains that O'Briant was ineffective for failing to conduct any pretrial investigation, his principal argument is that she did nothing to develop his vacation defense – a theory that he went to Texas not to obtain drugs, but to vacation. But according to the terms of the proffer agreement, had Laird testified at trial in support of the vacation defense, the Government could have impeached him with his own admissions. And while the Government could not have used Laird's proffer to impeach any other witness who testified in support of the vacation defense, attorney disciplinary rules precluded O'Briant from knowingly presenting false evidence or perjured testimony. *See Nix v. Whiteside*, 475 U.S. 157, 166 (1986) ("Although counsel must take all reasonable lawful means to attain the objectives of his client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law."); *U.S. v. Cronic,* 466 U.S. 648, 656 n.19 (1984).

Based on Laird's admission that he went from Michigan to Texas and back to purchase and distribute drugs, it is questionable whether O'Briant could have ethically presented *any* witnesses to advance Laird's vacation defense, which she knew to be contradicted by Laird's proffer. This

10

made it critical for her to engage in plea discussions with the government, particularly since this was her goal when she decided to represent Laird and it was likely that some or all of the co-defendants who entered guilty pleas would testify against him.

The Sixth Amendment right to effective counsel extends to the plea-bargaining process and is governed by the two-prong *Strickland* test. *Lafler v. Cooper*, — U.S. —, 132 S. Ct. 1376, 1384 (2012) (citing *Missouri v. Frye*, — U.S. —, 132 S. Ct. 1399, 1386-87 (2012)); *Hill v. Lockhart*, 474 U.S. 52, 57 (1985). To establish constitutionally ineffective assistance in the plea-bargaining process, the defendant must show not only that counsel was deficient, but that the outcome of the plea process would have been different with competent advice. *Lafler*, 132 S. Ct. at 1384 (citing *Frye*, 132 S. Ct. at 1388-89)).

The Supreme Court cases on counsel's deficient performance with regard to plea discussions generally fall into one of two categories: (1) counsel failed to communicate a favorable plea offer to the defendant before the time to accept the offer expired, *see, e.g., Frye* (counsel's failure to communicate a formal offer from the prosecution to accept a plea on terms and conditions that may be favorable to the accused constitutes deficient performance); or (2) counsel gave materially inaccurate sentencing information or advice to defendant who, based on that advice, rejected the offer and proceeded to trial, *see, e.g., Hill* (counsel's failure to accurately inform the defendant of the amount of time he would have to spend in prison before he became eligible for parole constituted deficient performance).

That this case may not fall squarely into either of these categories does not mean that Laird may not have a claim for ineffective assistance of counsel. However, the existing record does not reveal what, if any, discussions O'Briant had with Laird regarding the inadequacies of his proffer;

11

what discussions, if any, O'Briant had with the government regarding the proffer; why Laird omitted critical details in his proffer; and whether counsel's deficiencies, if there were any, impacted Laird's decision whether to stand trial or plead guilty. Accordingly, we decline to review the ineffective assistance of counsel claim on the merits at this time. The claim is denied without prejudice. Laird is free to raise the claim in a proceeding under 28 U.S.C. § 2255. *Henderson*, 174 F.App'x at 885. Because this is the only claim Laird raised on appeal, we AFFIRM his conviction.