In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-1005

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER A. JANSEN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 08-cr-50043 — **Frederick J. Kapala,** *Judge.*

ARGUED FEBRUARY 23, 2018 — DECIDED MARCH 7, 2018

Before FLAUM, SYKES, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* Defendant Christopher Jansen
pleaded guilty to one count of wire fraud and one count of tax
evasion. He later sought to withdraw his guilty plea, arguing
it was not "knowing and voluntary" because of ineffective as-
sistance of counsel. The district court denied that motion,
holding that Jansen's counsel was not ineffective. We affirm.
On the limited issue of restitution, we remand to allow the

district court to clarify that its imposition of restitution is a condition of supervised release rather than a criminal penalty.

## I. Background

### A. The Conduct, Investigation, & Charge

Defendant Christopher Jansen was the president and owner of Baytree Investors, Inc. ("Baytree"), an Illinois corporation that acquired trucking companies. In 2001, he learned that Dean Foods intended to sell one of its subsidiaries, DFC Transportation Company ("DFC"). DFC had millions of dollars of receivables that could be used as collateral to borrow money. Jansen created a Delaware corporation called DFCTC Holdings, Inc. ("DFCTC") for the sole purpose of purchasing DFC. In January 2012, DFCTC purchased DFC for $4.5 million, and Jansen issued DFCTC stock to officers and employees of DFC and Baytree investors.

After DFCTC purchased DFC, Jansen arranged for DFC to use its receivables to borrow money and transfer money to DFCTC. For instance, in 2002, $250,000 was transferred from a DFC bank account to a DFCTC bank account. Jansen distributed the money from DFCTC to himself and others for personal use. He did not seek authorization from DFC or DFCTC to make those transfers, and he did not disclose the transfers to directors or shareholders of the corporations. To receive income and disburse expenditures, Jansen and his business partner, Gilbert Granet, used a bank account in the name of an Illinois corporation, Talcott Financial Corporation ("Talcott"), which was dissolved in 1999.

As of 2005, Jansen allegedly had not filed a personal income tax return since 1996. Additionally, Baytree, Talcott, and

DFCTC had never filed corporate income tax returns or informational forms, and Talcott never issued Jansen any W-2 or 1099 forms. The tax due on Jansen's unreported 2002 income of $946,210.55 was $269,978.

At some point in 2003, the government initiated an investigation based on a tip by a former DFC employee. During the initial stages of the investigation, Jansen was represented by Michael Close. In 2005, Adam Bourgeois replaced Close. On March 12, 2007, the Assistant United States Attorney ("AUSA") sent Bourgeois a letter to open plea negotiations. For several months, Jansen discussed the charges and a possible plea agreement with Bourgeois.

On December 3, 2007, the government charged Jansen with a two-count information: (1) wire fraud pursuant to 18 U.S.C. § 1343; and (2) income tax evasion pursuant to 26 U.S.C. § 7201. On January 14, 2008, the government dismissed the two-count information because the parties were unable to reach a plea. Jansen then replaced Bourgeois with attorney Jeffrey Steinback. At the time Steinback took over, the government and defense had a strained relationship. Nevertheless, Steinback resumed negotiations and met with the AUSA, an IRS agent, and an FBI agent. On September 11, 2008, the government filed another two-count information charging Jansen with the same offenses.

## B.  The Guilty Plea & Post-Plea Proceedings

In October 2008, Jansen and the government entered into a written plea agreement. Jansen admitted his involvement in the fraudulent DFCTC scheme and admitted he did not report or pay income taxes in 2002. He also waived his right to chal-

lenge the wire fraud count on grounds that the five-year statute of limitations had lapsed. Additionally, Jansen agreed to cooperate with the government; the government stated that if Jansen provided "substantial assistance," it would recommend a sentence reduction under U.S.S.G. § 5K1.1. After a Rule 11 hearing, the court determined Jansen's plea was knowing, voluntary, and supported by facts satisfying the elements of the offenses. Jansen and the government agreed to periodically continue sentencing to allow for Jansen's continued cooperation. In January 2011, the government informed Jansen that he had not provided "substantial assistance" and therefore it would not make a recommendation to reduce his sentence pursuant to U.S.S.G. § 5K1.1.

On September 12, 2011, Steinback moved to withdraw from his representation of Jansen. He cited health concerns and stated that his relationship with Jansen "had begun to deteriorate." Steinback was replaced by Lawrence Beaumont, who requested Rule 16 discovery and obtained 42,700 documents related to the case. On December 9, 2011, Jansen filed a pro se motion to continue his sentencing proceedings because none of his prior attorneys, including Steinback, had requested or reviewed the Rule 16 documents. On February 2, 2012, Beaumont withdrew as well, citing irreconcilable differences; he was replaced by Stephen Richards. One week later, Jansen indicated to the court that he wished to withdraw his guilty plea. On April 6, 2012, Richards also withdrew. The court permitted Jansen to proceed pro se.

On July 6, 2012, Jansen filed a motion to withdraw his guilty plea. He asserted three bases: (1) the government's breach of the plea agreement; (2) ineffective assistance of

counsel on the part of attorney Steinback; and (3) prosecuto-
rial misconduct. Relevant to this appeal is only the ineffective
assistance of counsel claim.[1]

### C. Evidentiary Hearing

The court held an evidentiary hearing at which several
witnesses testified, including Steinback. Due to health issues,
Steinback's testimony took place on six dates, including a sev-
enteen-month break during direct examination.

At his first direct examination, on February 8, 2013, Stein-
back maintained that his counsel was appropriate. He ex-
pressed a belief that he was hired specifically "to work on ne-
gotiating a plea agreement" because Jansen knew that he
"specialized in … negotiations and plea bargains." His goal
was to get the "best outcome possible with respect to sentenc-
ing." Especially due to the "strained" relationship between
Jansen and the government, Steinback believed that "cooper-
ation" with the government was required.

Steinback further explained that as a result of a "conflu-
ence of different items," including information learned from
discussions with the AUSA, Granet, and Jansen himself,
Steinback discovered "[t]here was a very large investiga-
tion … [and] a belief on the part of the government that [Jan-
sen] had engaged in multiple areas of misconduct, not just the
areas that ultimately resulted in the guilty plea." For instance,
Steinback believed there were "many years that [Jansen]
hadn't filed tax returns" and "many years [Jansen] had en-
gaged in different businesses that the government contended

---

[1] Jansen abandoned the breach of plea agreement claim and does not
appeal the district court's rejection of the prosecutorial misconduct claim.

involved fraudulent misconduct." Thus, Jansen's strategy was to "proceed with relative expediency with respect to the plea [in order to] avoid [or] stop an investigation into a variety of different entities that [Jansen] … had [at] one time been a part of." Steinback stressed his belief that if he could "expediently resolve the plea," the government would "not refer to or include any of those other matters as relevant conduct."

As to Jansen's allegations regarding Rule 16 discovery, Steinback agreed it was routine to request discovery from the government in this sort of case. He maintained, however, that Jansen's case "was not in a routine posture." He concluded that it was in Jansen's "best interests" to not request discovery because if the AUSA "delve[d] into all of the other investigative matters that he[] [was] willing to forego [sic]," he might "rethink his position." In short, Steinback stated:

> I am a negotiator, and I told you that I would do the absolute best job I could do for you, and it was my judgment after speaking with the government that the best job I could do for you was to negotiate a deal which cut [the government] off. And did it require some good faith belief on my part that [the AUSA] was telling me the truth? Yes it did.

Steinback's direct examination resumed on July 31, 2014. This time, Steinback had a different tenor. He expressed a belief that he had not provided adequate counsel. He reiterated that he had his "reasons" for not reviewing the government's documents, but acknowledged that not doing so was a "shortcoming." He stated that reviewing the documents would have "made [his] understanding of the case fuller" and "discharged [the] obligation to make … full investigations."

On cross, Steinback confirmed that he had explained all aspects of the plea to Jansen, including the statute of limitations waiver. Steinback also stated he believed Jansen withdrew his guilty plea because the government would not request a downward departure based on "substantial assistance" under § 5K1.1.

Of added note for our purposes, Steinback also testified about civil litigation between him and Jansen that occurred in 2012 and 2013. Jansen had filed two lawsuits and a complaint with the Illinois Attorney Registration & Disciplinary Commission ("ARDC") against Steinback. In the first lawsuit, a $39,000 default judgment was entered in favor of Jansen. On April 1, 2013, Steinback and Jansen entered into a mutual release; Steinback would pay Jansen $52,500 to satisfy the default judgment, and Jansen would agree to dismiss the second case. Steinback stated that he paid $19,500 of that $52,500.

Steinback further testified that in several e-mails between April and July 2013, Jansen complained that Steinback had not completed the default judgment payment. On September 10, 2013—following Steinbeck's first direct examination—Jansen sent an e-mail attaching a "proposed statement" based on "the prospect of additional information that [Steinback was] willing to provide." Attached was a document titled "Statement of Jeffrey B. Steinback," which admitted to rendering ineffective assistance of counsel. Steinback stated that "additional information" meant "a conclusion [he] had drawn concerning [his] shortcomings in connection with [his] representation … that [he] had not appropriately handled discovery." Steinback stated he did not sign the document because it "would have falsely stated a number of things."

On November 11, 2013, Steinback sent an e-mail to Jansen expressing a desire to settle the civil actions. He wrote that he did not believe he provided adequate representation and concluded that Jansen could not have made a knowing and informed guilty plea. Steinback testified at the evidentiary hearing that he sent the e-mail because the civil litigation and ARDC complaint forced him "to review and reconsider" his representation. Shortly thereafter, Jansen sent Steinback an e-mail reply that said "SEE ATTACHED PER OUR AGREEMENT"; attached were draft orders dismissing the civil actions. At the hearing, Steinback claimed he and Jansen did not make any deal. Ultimately, Steinback never paid the rest of the money owed under the mutual release, and Jansen withdrew the ARDC complaint.

After the evidentiary hearing was completed, the district court denied Jansen's motion to withdraw his plea, holding that Steinback's conduct did not rise to the level of ineffective assistance of counsel.

### D.  Sentencing and Judgment

The court held sentencing proceedings on December 14 and December 28, 2016. It sentenced Jansen to 70 months' imprisonment and 3 years of supervised release. It also ordered a restitution payment of $269,978 to the IRS for the 2002 tax loss. However, despite recognizing at the hearing that restitution for a tax offense can only be a condition of supervised release, the court issued a judgment which listed restitution as a "criminal monetary penalty," due during imprisonment. This appeal followed.

## II. Discussion

### A. Withdrawal of Guilty Plea & Ineffective Assistance of Counsel

"The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). "[A] defendant does not have an absolute right to withdraw a plea before sentencing." *United States v. Chavers*, 515 F.3d 722, 724 (7th Cir. 2008) (quoting *United States v. Carroll*, 412 F.3d 787, 792 (7th Cir. 2005)). However, he "may withdraw a plea of guilty … [if he] can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). "Because the defendant's statements at the plea colloquy are presumed to be true, the defendant bears a heavy burden of persuasion in showing that such a fair and just reason exists." *Chavers*, 515 F.3d at 724; *see also United States v. Graf*, 827 F.3d 581, 584 (7th Cir. 2016) ("A defendant's motion to withdraw is unlikely to have merit if it seeks to dispute his sworn assurances to the court.").

"[P]lea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process … that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages." *Missouri v. Frye*, 566 U.S. 134, 143 (2012); *see also Lafler v. Cooper*, 566 U.S. 156, 163 (2012) ("During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970))). Thus, "a plea, even one that complies with Rule

11, cannot be 'knowing and voluntary' if it resulted from ineffective assistance of counsel." *Hurlow v. United States*, 726 F.3d 958, 968 (7th Cir. 2013). We apply the two-part *Strickland* test to ineffective assistance of counsel claims in the plea bargain context. *Frye*, 566 U.S. at 140. First, the defendant must show deficient performance—"that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Second, the defendant must show prejudice—"that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

On review, "[w]e will uphold a district court's factual findings about the existence of a fair or just reason to withdraw the plea unless they are clearly erroneous, and we will review the district court's ruling on the motion to withdraw for an abuse of discretion." *Chavers*, 515 F.3d at 724. Therefore, "[r]eversals are rare, though not unheard of." *Graf*, 827 F.3d at 583–84.

Here, the district court held Steinback's counsel was not ineffective, and thus, that Jansen's plea was knowing and voluntary. This was not an abuse of discretion.

### 1. *Performance*

"The proper measure of attorney performance [is] simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. For Steinback's performance to fall below an objective standard of reasonableness, Jansen must show that Steinback "performed seriously below professional standards." *United States v. Williams*, 698 F.3d 374, 386 (7th Cir. 2012). Our "scrutiny of an attorney's performance is 'highly

deferential' to eliminate as much as possible the distorting effects of hindsight, and we 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Vinyard v. United States*, 804 F.3d 1218, 1225 (7th Cir. 2015) (quoting *Strickland*, 466 U.S. at 689). "Under these standards, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Id.* (quoting *Strickland*, 466 U.S. at 690); *see also United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005) ("Generally when an attorney articulates a strategic reason for a decision, the court defers to that choice."). Indeed, "[i]f an attorney's decision was sound at the time it was made, the decision cannot support a claim of ineffective assistance of counsel." *Cieslowski*, 410 F.3d at 360. Still, "an attorney's decisions are not immune from examination simply because they are deemed tactical." *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 249 (7th Cir. 2003). "A strategic choice based on a misunderstanding of law or fact … can amount to ineffective assistance." *Vinyard*, 804 F.3d at 1225.

Jansen argues that Steinback's conduct was objectively unreasonable because he "made no investigation into any of the government's purported case, discovery or otherwise." It is true that generally, "a reasonably competent lawyer will attempt to learn all of the relevant facts of the case, make an estimate of a likely sentence, and communicate the results of that analysis to the client before allowing the client to plead guilty." *Bethel v. United States*, 458 F.3d 711, 717 (7th Cir. 2006). However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Put another way,

counsel can "make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Moreover, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.*

Jansen points out that Steinback did not request records, interview witnesses, or examine "the extent of the government's investigation into other crimes, and the government's other possible charges." According to Jansen, some investigation was necessary to "test the government's evidence" and "put it through some form of adversarial testing." He maintains that Steinback's proffered "strategic reasons for not conducting investigation into the government's evidence" are merely "hollow excuses." Moreover, Jansen claims that Steinback "could not have appropriately advised [him] to plead guilty to counts outside the statute of limitations if he did not know what the alternative counts could or would be."

Jansen's argument is unpersuasive. The district court made the sound factual finding that Jansen hired Steinback "to negotiate the best possible plea agreement," not to go to trial:

> The evidence makes clear … that by the time defendant hired Steinback he had already decided to plead guilty and did not hire Steinback to vet the evidence, formulate defenses, and defend him at trial. Rather, defendant employed Steinback to negotiate the best possible plea agreement with the government after it had ceased negotiating with him and his prior counsel.

The court's determination is supported by Steinback's testimony at the evidentiary hearing. Indeed, Steinback stated that Jansen "never once indicated a desire to go to trial"; if he had, Steinback "would have referred him to a trial lawyer." Moreover, the district court noted that Jansen's "unusual—but not completely uncommon—practice" of presenting a plea agreement prior to indictment "strongly indicate[d] a specific intention to plead guilty." In short, the court concluded that the notion that Steinback was hired solely to negotiate a plea "stands uncontradicted." While it is true, as Jansen argues, that "there is no mention in the record that Mr. Jansen and Steinback explicitly agreed that the only possible outcome in this case was a guilty plea," the court's finding is not clearly erroneous.

To be sure, that Steinback was hired to negotiate a plea does not immunize him from a charge of providing ineffective counsel. However, the purpose behind his hiring does lend credence to his decision to not conduct an in-depth investigation into the government's evidence. The district court determined that Steinback formulated a "four-fold" "tactical strategy" that included forgoing investigation and discovery, and held that such a strategy was objectively reasonable. Specifically, the court concluded:

> (1) he did not want to lose the tactical advantage presented when the government agreed to reopen plea negotiations; (2) he wanted to avoid making a request for discovery that might cause the government to take a fresh look at its evidence and rethink its position such that it would not be willing to maintain a favorable offer;

(3) he believed it was critical to stop the govern-
ment's investigation of defendant in order to
keep matters not yet fully investigated from be-
ing charged or being raised as relevant conduct
at sentencing, and (4) he wanted to avoid a
newer charge that would have carried a higher
statutory maximum penalty.

Likewise, the district court reasoned that Steinback's ad-
vice to Jansen to waive his statute of limitations defense was
objectively reasonable because it was given in furtherance of
the same strategy—that is, "in exchange for the government's
agreement not to bring other charges against defendant, or to
raise those matters as relevant conduct."

In light of the fact that Steinback was hired to negotiate the
best possible plea, the court's conclusion is not an abuse of
discretion. Steinback reasonably believed the government's
investigation included conduct beyond the two counts for
which Jansen was charged. Specifically, he suspected that Jan-
sen had not filed many years' worth of tax returns and had
regularly engaged in businesses involved in fraudulent mis-
conduct. Of course, because Steinback formed that belief in
part from his conversations with the AUSA, the strategy "re-
quire[d] some good faith belief" that the government was tell-
ing the truth. But the strategy was also supported by a "con-
fluence of different items," including information Steinback
learned from discussions with Granet and Jansen himself.

Steinback believed that if Jansen agreed to a plea at "rela-
tive expediency," he could "stop investigation" into Jansen's
other misconduct. The government had already agreed not to
consider the other, more recent activity as relevant conduct

and agreed not to bring charges based on those actions. Stein-back worried that if he investigated the government's evidence, the government could change its mind.[2] Likewise, Steinback worried that the government would bring other charges if Jansen did not waive the statute of limitations defense. This could have proven particularly harmful because in 2002, Congress increased the maximum imprisonment term for wire fraud. Jansen was subject only to a five-year maximum; if the government had brought wire fraud charges based on more recent conduct, Jansen could have faced a twenty-year prison term. In short, Steinback's decisions were strategically motivated. As a result, the district court did not abuse its discretion.[3]

Jansen also points out that "Steinback eventually admitted his representation was inadequate." While this is true, it is not

---

[2] Jansen is correct that a decision "based on convenience and not on content … cannot be called strategic." *United States v. Hemphill*, 86 F. App'x 985, 989 (7th Cir. 2004). However, his argument that "[i]t is more likely Steinback's perceived 'rush' was for his own purposes" ignores the various tactical reasons identified by the district court.

[3] Jansen cites several cases for the proposition that Steinback's actions were objectively unreasonable. They are not persuasive. For example, in *Kimmelman v. Morrison*, the Supreme Court held that counsel was ineffective because he offered "only implausible explanations" for his failure to conduct reasonable investigation and pre-trial discovery. 477 U.S. 365, 386 (1986); *see also United States v. Mohammed*, 863. F.3d 885, 891 (D.C. Cir. 2017) (holding that an attorney's decision to not conduct pre-trial investigation was unreasonable because there was no reason to think the investigation would be fruitless or harmful). In contrast, Steinback offers multiple plausible explanations for his strategy. Additionally, cases such as *Porter v. McCollum*, 558 U.S. 30, 39–40 (2009), and *Rompilla v. Beard*, 545 U.S. 374, 385 (1985), are distinct because they involve the specific context of post-conviction hearings.

a persuasive reason to find ineffective assistance of counsel. First, "[a] defense counsel's self-confessed admission of deficient representation does not constitute ineffectiveness *per se; it is just one factor to be considered in determining whether counsel was constitutionally ineffective." *United States v. Laird*, 591 F. App'x 332, 337 (6th Cir. 2014); *see also Edwards v. Lamarque,* 475 F.3d 1121, 1126 (9th Cir. 2007) ("[T]he trial court was not obligated to accept a self-proclaimed assertion by trial counsel of inadequate performance." (internal quotation marks omitted)). Second, as the district court recognized, "the earnestness of Steinback's new opinion is called into serious question as it appears to have been at least partially coerced by defendant."

Finally, both parties ask us to examine American Bar Association ("ABA") standards. However, while "[p]revailing norms of practice as reflected in [ABA] Standards and the like … are guides to determining what is reasonable," they need not drive our analysis. *Strickland*, 466 U.S. at 688. Indeed, ABA rules "are 'only guides' and not 'inexorable commands.'" *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010) (first quoting *Strickland*, 466 U.S. at 688; then quoting *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (per curiam)). Regardless, the ABA Guidelines do not speak clearly as to whether Steinback's counsel was ineffective.[4]

---

[4] Jansen points to the ABA Standards for Criminal Justice: Prosecution and Defense Function, Duty to Investigate and Engage Investigators, 4-4.1 (4th ed. 2015), which speaks to a defense counsel's general duty to investigate. In contrast, the government points to the ABA Standards for Criminal Justice: Pleas of Guilty, Responsibilities of Defense Counsel, 14-3.2 (3d ed. 1999), which discuss a defense counsel's obligations in the specific context of guilty pleas. A comment to that section recognizes that "there may

### 2. *Prejudice*

In addition to showing deficient performance, "[i]n the context of pleas a defendant must show that the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163. "[A] mere allegation by the defendant that he would have insisted on going to trial is insufficient to establish prejudice." *Cieslowski*, 410 F.3d at 359 (quoting *Berkey v. United States*, 318 F.3d 768, 772–73 (7th Cir. 2003)). Instead, "the defendant must show that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. Specifically, where a defendant alleges that counsel failed to investigate, whether there is prejudice "will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." *Id.*

According to the district court, Jansen did "not come forward with objective evidence that had Steinback obtained the discovery he would not have pleaded guilty." It concluded that Jansen made, at most, "conclusory allegations" that he would have proceeded to trial. The court correctly recognized

---

be some cases in which defense counsel legitimately determines that a better plea agreement may be available if the defendant enters a plea at a point in time before all of his or her discovery rights may apply." The comment goes on to state that "an 'appropriate' investigation may be quite limited … where a highly favorable pre-indictment plea is offered, and the pleas offered after indictment are likely to carry significantly more severe sentences." To the extent ABA Guidelines are persuasive, Guideline 14-3.2 is more relevant because it specifically references the facts presented here. Indeed, as the government states, "[t]he Comment's pre-indictment plea example represents circumstances that parallel those faced by Steinback when he chose not to seek discovery from the government."

that *Strickland* requires more. Further, the court determined that "the evidence [was] contrary to defendant ever having the intent to go to trial rather than plead guilty." This determination was not clearly erroneous.

The district court found that Jansen "hired Steinback to negotiate a plea agreement because Steinback was a plea bargaining specialist," and that Jansen never "indicate[d] to Steinback that he wanted to go to trial." The court reasonably relied on these facts to determine that even if Steinback had conducted an investigation into the government's evidence, he still would have recommended that Jansen plea, and there was no reasonable probability that Jansen would have insisted on going to trial. *See Tezak v. United States*, 256 F.3d 702, 712 (7th Cir. 2001) (holding "[t]here was no reasonable probability that [the defendant] would have insisted on going to trial" where the evidence suggested the defendant "wanted the plea agreement and was not considering any other alternative" and "brought in [the attorney] specifically to close the plea agreement deal").

Additionally, the district court concluded that Jansen first desired to withdraw his plea when the government refused to recommend a sentence reduction under U.S.S.G. § 5K1.1. Thus, Jansen's change of heart appears less motivated by Steinback's lack of investigation than the government's denial of "substantial assistance" credit. This finding was supported by Steinback's testimony at the evidentiary hearing. He stated that he believed Jansen's motive for seeking to withdraw his guilty plea was based on the "report[] to the court that [Jansen's] cooperation … would not result in a 5K downward departure request from the government."

In sum, Jansen failed to demonstrate that, but for Steinback's alleged ineffective performance, he would not have pleaded guilty but instead would proceed to trial.

## B. Restitution

"We review de novo questions of law involving the district court's authority to order restitution." *United States v. Hassebrock*, 663 F.3d 906, 923 (7th Cir. 2011). "[R]estitution is not permitted … for offenses that fall within Title 26 of [the] United States Code." *Id.* However, "district courts possess the authority to impose restitution for tax offenses as a condition of supervised release." *Id.* at 924. "Because a district court can only impose restitution as a condition of supervised release, a defendant cannot be required to pay restitution until his period of supervised release begins." *Id.*

The judgment below orders Jansen to pay $269,978 in restitution for tax evasion as a "criminal monetary penalt[y]." As a condition of Jansen's supervised release, he is required to pay monetary penalties "immediately." Taken together, these documents impose restitution as a penalty for the tax offense rather than as a condition of supervised release, and as such requires the restitution to be paid prior to the supervise release period. This is not permitted. Thus, in accordance with both parties' request, we remand to allow the district court to clarify that the court does not impose restitution as a criminal penalty, but rather as a condition of supervised release.[5]

---

[5] As in *Hassebrock*, it "seems likely that the court was aware that it could only impose restitution as a condition of supervised release." 663 F.3d at 925. At the sentencing hearing, the district court, citing *Hassebrock*, expressly stated that it could not "order restitution except as a condition of supervised release."

### III. Conclusion

For the foregoing reasons, the order of restitution is VACATED, and the case is REMANDED for further proceedings consistent with this opinion. In all other respects, the district court's judgment is AFFIRMED.