NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 15, 2018
Decided November 29, 2018

**Before**

WILLIAM J. BAUER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 17-3606

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 1:11-cr-00580-2 |
| STEVEN PAUL, *Defendant-Appellant.* | Ronald A. Guzman, *Judge.* |

## O R D E R

After Steven Paul pleaded guilty to healthcare fraud, he sought to withdraw his plea on two grounds. First, he argued that the government had offered him immunity in exchange for his cooperation. Second, he contended that, because of the supposed agreement not to prosecute, his lawyers were ineffective for allowing the prosecution to proceed. The district court denied his motion. It ruled that the government had never promised immunity and Paul's lawyers had rendered adequate counsel. Because the record supports these findings, the denial of the motion to withdraw was a permissible

exercise of discretion. We thus reject Paul's challenge to the district court's ruling and affirm the judgment.

## Background

Paul jointly owned and operated chiropractic clinics in the suburbs of Chicago. The government investigated Paul and others for using these clinics to bill Blue Cross/Blue Shield fraudulently for services that were either medically unnecessary or never actually provided. The insurance company was defrauded into paying Paul's clinics approximately $1.3 million.

After federal agents contacted Paul in February 2009 about the investigation, his defense team sought over the next six years to obtain immunity or other relief from prosecution in exchange for Paul's cooperation with the government. These extended attempts are reflected in correspondence, affidavits, and testimony presented to the district court, which are recounted below.

Paul testified that the government never gave him a written immunity deal or told him personally, "you [are] getting immunity." But during their years of negotiations, Paul's attorneys repeatedly assured him that he could receive immunity for his cooperation. With cooperation in mind, in April 2009 Paul signed an agreement with federal prosecutors. It provided that in exchange for Paul's truthful proffer of information, the proffer would not be used against him in a later prosecution. The agreement, however, allowed the government to prosecute Paul if his proffer led to the discovery of new evidence against him: "The government is completely free to pursue any and all investigative leads derived in any way from the proffer, which could result in the acquisition of evidence admissible against your client." The letter concluded: "This letter embodies the entirety of the agreement to make a proffer. No other promise or agreement exists between you or this office regarding the proffer."

Paul's cooperation continued, and six months later, in October 2009, he and his defense team met with the government to prepare Paul's statement to a grand jury. The meeting became contentious: Paul still wanted immunity in return for his testimony, but the Assistant United States Attorney (AUSA) offered only to defer prosecution. The AUSA's "draft" proposal to defer prosecution lacked signatures, a specified amount of restitution, and details of what Paul would admit. According to one of Paul's lawyers, after the defense team fumed at the perceived discrepancy between their discussions

and the AUSA's offer, the AUSA "apologized" and "realized that offer was not what had been promised."

After the meeting, Paul and the defense team reviewed their options. They discussed the import of a deferred-prosecution agreement. One lawyer described it as "prosecutor's probation"; if Paul met its terms, he would not be prosecuted. The lawyer advised him to reject the deferred-prosecution proposal and hold out for immunity. Paul did so and continued to assist the government's investigation. According to Paul's lawyer, the AUSA was encouraging: the AUSA said that a discussion about "immunity was back on track." The defense team thought that one obstacle to concluding an immunity deal was Paul's refusal to pay restitution, so in May 2010 Paul gave $150,000 to Blue Cross/Blue Shield and received a release.

But an immunity deal never materialized. In frustration, a year later, in June 2011, one of Paul's lawyers wrote to the AUSA to review the chronology of the fluctuating conversations about immunity. According to the lawyer, in 2009 the government stated that it "cannot guarantee immunity." Then, in January 2010, the lawyer thought that "the government might immunize Dr. Paul." Later, in June 2010 (after Paul's $150,000 payment), the government reported "second thoughts about Dr. Paul's restitution." Finally, in April 2011, the defense team "was caught off guard" when the government asked, "Why is Dr. Paul deserving of immunity?" Paul's lawyer implored the government to consider Paul's cooperation "as it weighs the prosecutorial decision." The government, however, never changed its position on refusing to grant immunity.

Paul's strategy changed in the fall of 2011. One of his lawyers had asked the government to revive the deferred-prosecution offer, but the prosecutor declined. With his options diminished, Paul signed a plea letter. The letter provided that Paul would plead guilty to one count of healthcare fraud and the government would recommend that the court sentence Paul below the applicable guidelines range.

A year later, in 2012, Paul entered a formal plea agreement and pleaded guilty to one count of healthcare fraud. At the change-of-plea hearing, he swore that he was fully satisfied with his attorneys' advice and representation, had read the written plea agreement, understood its terms, and entered into it voluntarily. The signed plea agreement "represent[ed] the entire understanding that [he] had with the government about [his] guilty plea," and no one had made any other promises to him inducing him to plead guilty.

Over the next two years, Paul's lawyers tried still to avoid prosecution. They renewed their request for deferred prosecution, but the government again declined to offer it and stood by the plea agreement. With new counsel in May 2015, Paul tried a new strategy. He asked for a "*Kastigar-Palumbo*" hearing and to withdraw his plea. In *Kastigar v. United States*, 406 U.S. 441 (1972), the Court ruled that when the government prosecutes someone after granting that person use or derivative-use immunity, the Fifth Amendment requires a hearing to determine if the government's evidence came from an independent source. In *United States v. Palumbo*, 897 F.2d 245 (7th Cir. 1990), we ruled that informal grants of immunity also necessitate a *Kastigar* hearing. Paul raised two arguments in his motion. First, he contended that because (in his view) the government had promised him transactional immunity for his cooperation, he should be allowed to withdraw his guilty plea. Second, Paul maintained that he had received ineffective assistance of counsel, so his plea was involuntary. He complained that his former attorneys should have used the immunity deal to challenge his indictment and that they did not inform him about or explain the deferred-prosecution offer.

The district court granted Paul partial relief. It denied his request for a *Kastigar-Paulmbo* hearing because no evidence suggested that the government had offered him immunity; the parties were merely negotiating. Paul also failed to explain, the court reasoned, why he signed the plea agreement if he believed he had a promise of immunity. The court then turned to the ineffective-assistance claim. Because Paul had never received immunity, his counsel was not ineffective for failing to challenge the indictment on that basis. (Paul does not challenge this ruling on appeal.) But the district court granted Paul a limited hearing on his claim that, because his counsel did not advise him about the deferred-prosecution offer, he should be allowed to withdraw his plea.

After the hearing, the court ruled that Paul's counsel was not ineffective and that the guilty plea would remain. The court observed that the "draft" proposal from October 2009 about deferred prosecution did not specify a restitution amount or Paul's offenses, so it did not require advice to Paul. But in any case, Paul's lawyer *had* told Paul about it, and he and counsel strategically chose not to pursue it because they wanted to go for immunity and were unsure if Paul could pay the restitution that would accompany deferred prosecution. The court later sentenced Paul to 20 months in prison.

## Analysis

On appeal, Paul first argues the district court erred by denying his motion for a *Kastigar-Palumbo* hearing. He contends that the government's statements to his defense attorneys that immunity was "back on track" reasonably induced him to give up his Fifth Amendment right against self-incrimination and to cooperate with the government. The hearing, Paul concludes, would show that the government promised not to use his testimony, so any evidence that it derived from his testimony and used against him to induce his guilty plea is barred.

To receive a *Kastigar-Palumbo* hearing, Paul must raise a "significant, disputed factual issue regarding whether or not the government made a formal or informal grant of immunity to [him]." *See United States v. Quintanilla*, 2 F.3d 1469, 1483 (7th Cir. 1993). He has not, for three reasons. First, no dispute about immunity arises if, as here in the proffer letter, the government merely promised that "nothing the [defendant] said could be attributed to him or used against him, but that the government would be free to follow any leads provided by [defendant] against him." *See United States v. Lyons*, 670 F.2d 77, 80 (7th Cir. 1982). In *Lyons*, although the district court held a *Kastigar* hearing, after reviewing a proffer agreement exactly like Paul's, we ruled that in light of that agreement the defendant had *not* been granted immunity. *Id.*; *see also United States v. Sophie*, 900 F.2d 1064, 1071 (7th Cir. 1990) (ruling that statements from the government akin to "I cannot promise anything" but "I'll see what we can do" are insufficient to trigger an evidentiary hearing).

Second, as the district court permissibly found, Paul has conceded that he received no promises of immunity. In his written plea agreement, in his initial proffer letter, and during the colloquy at his change-of-plea hearing, Paul stated that the plea agreement encompassed all promises that the government had made to him. He admitted under oath that no document or statement from the prosecution reflects an immunity deal. Although Paul might try to contradict this previous, sworn testimony in order to create a factual dispute that would require a hearing to resolve, he must explain why his earlier testimony was wrong, and he has not attempted to do so. *Cf. Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806–07 (1999) (noting the federal circuits have unanimously held a party cannot create a fact dispute by contradicting his previous sworn statement without an adequate explanation); *United States v. Purnell*, 701 F.3d 1186, 1190–91 (7th Cir. 2012).

Third, Paul's lawyer admitted in his June 2011 chronology to the AUSA that no immunity agreement ever materialized. That concession, too, obviates the need for a hearing. *See Quintanilla*, 2 F.3d at 1482–83. It is true that Paul's lawyers expected to receive an immunity agreement, and the AUSA at one point said that immunity was "back on track." But these statements reflect only negotiations about immunity, as the chronology from Paul's lawyer itself confirms, not a concluded deal. *See United States v. Eliason*, 3 F.3d 1149, 1153 (7th Cir. 1993) (affirming denial of *Kasitgar* hearing where defendant volunteered information hoping for favorable treatment).

Paul responds with cases in which a *Kastigar* hearing was granted, but they are distinguishable because each involved either a government concession of immunity, *see Palumbo*, 897 F.2d at 248, or a defendant's sufficiently detailed assertion of an immunity agreement. *See United States v. Cahill*, 920 F.2d 421, 425 (7th Cir. 1990) (defendant's assertion that government orally granted defendant transactional immunity led to evidentiary hearing). Neither has occurred here. Indeed, in his statements to the district court about immunity, Paul never described the supposed agreement. None of his statements provide "what the terms of the promise were; when, where, and by whom the promise had been made; and the identity of [the] witness[es] to its communication." *Blackledge v. Allison*, 431 U.S. 63, 76 (1977) (habeas-corpus proceeding).

The foregoing discussion also defeats Paul's contention that we should in this case recognize and apply to him the doctrine of "equitable immunity." Under the doctrine, some kind of promise by the government not to prosecute is generally required. *See, e.g., United States v. Fuzer*, 18 F.3d 517, 521 (7th Cir. 1994); *United States v. Weaver*, 905 F.2d 1466, 1474 (11th Cir. 1990). But in *Patel v. United States*, we reserved judgment on whether to recognize the doctrine of "equitable immunity" because the defendant had signed a letter agreement providing that "the government was free to pursue investigative leads contained in [his] proffer." 19 F.3d 1231, 1236 (7th Cir. 1994). Paul too signed a proffer letter stating that the government could pursue any investigative leads from the proffer. Paul did not present evidence that the parties ever modified this agreement, so his contention that "his proffer agreement(s) morphed into immunity representations by the government" fares no better. *See Weaver*, 905 F.2d at 1471–73.

Paul also challenges the district court's refusal to allow him to withdraw his guilty plea based on ineffective assistance of counsel. We review that decision for abuse of discretion. *See United States v. Graf*, 827 F.3d 581, 582–83 (7th Cir. 2016). Paul argues

that his counsel was deficient in advising him to reject the deferred-prosecution proposal that the AUSA presented in October 2009.

The government responds that Paul's argument is forfeited. According to the government, Paul previously argued that his lawyers were ineffective because they never explained the deferred-prosecution agreement to him, whereas now he argues that his lawyers were deficient for advising him to *reject* it. Although the two arguments are related, the district-court record shows that Paul argued only that his lawyers were ineffective for failing to advise him about the agreement. And this is the argument that the district court addressed in its order denying Paul's motion. Because Paul now presents a new theory of relief, it has been forfeited. *See United States v. Middlebrook*, 553 F.3d 572, 577 (7th Cir. 2009); *see also Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008).

Regardless, his argument is meritless. To show the district court that a plea was involuntary because of ineffective assistance, a defendant must demonstrate both that counsel's performance was objectively unreasonable and a reasonable probability that he would have not pleaded guilty or would have obtained more favorable terms had counsel been effective. *United States v. Jansen*, 884 F.3d 649, 655–56 (7th Cir. 2018). Strategic decisions that were sound at the time they were made do not support an ineffective-assistance claim. *See id.* at 656.

The district court acted within its discretion in denying Paul's motion to withdraw his guilty plea because Paul cannot establish ineffective assistance of counsel. His attorneys offered two strategically reasonable grounds for rejecting a deferred-prosecution proposal in October 2009. They thought that Paul lacked the ability to pay sufficient restitution and that he could pursue an immunity deal through enhanced cooperation. Although Paul denied that his attorneys explained these considerations to him, the district court's finding to the contrary was not clearly erroneous. *See id.* at 656. Multiple emails and testimony establish that Paul's lawyers discussed these considerations with him on several occasions. Relying on hindsight, Paul responds that this advice was poor because the government later refused to re-offer deferred prosecution or offer immunity. But an unwanted outcome to a reasonable strategy does not render the strategy constitutionally deficient. *See Missouri v. Frye*, 566 U.S. 134, 145–47 (2012); *see also United States v. Springs*, 988 F.2d 746, 749 (7th Cir. 1993) ("Prosecutors need not offer discounts and may withdraw their offers on whim."). In any case, Paul cannot show prejudice. He does not challenge the district court's ruling that the deferred-prosecution proposal was too indefinite to be an offer. Thus, even if his

lawyers had advised him to pursue negotiations about it, there is no reasonable probability that those negotiations would have led to a mutually acceptable offer. The district court's denial of Paul's motion to withdraw his guilty plea was therefore not an abuse of discretion.

AFFIRMED